UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles J. SPEARS, also known as
"Blackie," and Donald Meeks,
Defendants–Appellants.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Kim CURRAN, Defendant–Appellee.

Nos. 89–3154, 90–1009 and 89–3303.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 6, 1991.

Decided June 2, 1992.

As Amended June 9, 1992.

K. Tate Chambers, Asst. U.S. Atty., Peoria, Ill. (argued), for U.S. in Nos. 90–1009 and 89–3154.

K. Tate Chambers, Asst. U.S. Atty. (argued), Peoria, Ill., J. William Roberts, U.S. Atty., Springfield, Ill., for U.S. in No. 89–3303.

Clifton J. Mitchell (argued), Jackson, Mitchell & Collier, Peoria, Ill., for Donald Meeks.

Suzanne Philbrick, Chesterton, Ind. (argued), for Charles J. Spears.

Richard H. Parsons, Peoria, Ill. (argued), for Kim Curran.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and MORAN, Chief District Judge.[*]

BAUER, Chief Judge.

In this consolidated appeal, defendants Spears and Meeks appeal from their convictions and sentences, and the government appeals the sentence imposed on defendant Curran. We affirm as to Spears and Meeks; we reverse and remand as to Curran.

## I. Facts

In April 1988, Operation Iron Eagle, a code name for a drug task force investigation, focused on Charles "Blackie" Spears. Jeff Casey, an informant, told Illinois State Police ("ISP") Sergeant Kürt Kabat that Spears was transporting large amounts of cocaine into the Peoria area. A month later, Casey told Kabat that Spears and his girlfriend, Kim Curran, would be traveling to Florida to obtain cocaine. With the information from Casey, and from another informant, undercover agents arranged to purchase one ounce of cocaine from Curran on June 21. Before she met with the undercover agents, investigators observed her meeting with Spears.

On July 14, Curran was arrested on an outstanding warrant, and charged as well with the drug sale to the undercover agents. At the police department, she was interviewed by Charles Schofield of the Peoria County Sheriff's Police, who, at the time, was the Director of the Multi–County Enforcement Group ("MEG"). Curran was advised of, and waived, her constitutional rights before talking to Schofield. In that meeting, Curran admitted that Spears provided the cocaine she sold on June 21 to undercover agents. She told Schofield that Spears obtained cocaine from some Colombians in Florida, that he made frequent trips there to pick up cocaine, and that on two occasions she traveled with him. According to Curran, Spears sold approximately a kilo of cocaine a week. She told them that Leonard Spears, Blackie's brother, headed the entire operation. Leonard, who was incarcerated at the time, made the connection with the Colombians while in prison.

On August 29, 1988, a confidential source contacted Assistant United States Attorney Lee Smith with information about Spears's drug peddling operation. Smith, in turn, introduced ISP Officer Edie Casella to the source over the telephone. The source agreed to meet with Casella, and at their first meeting, told Casella that Curran and Spears would be driving to Peoria from Texas in a black 1983 Peugeot (which, as agents later discovered, was registered to Spears's wife) with a large quantity of cocaine. At their second meeting, at which Drug Enforcement Administration ("DEA") Agent Ed Halligan was present, the source offered additional details about Spears's drug purchase. She said that

[*] The Honorable James B. Moran, Chief Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

Spears and Curran left Peoria on August 27 for Houston, that they planned to pick up one to five kilos of cocaine from someone named Larry, that they had $50,000 in cash with them, and that they were in a black 1983 Peugeot.

The source also outlined Spears's entire drug operation. She related that Spears had been in the cocaine business for about a year. Leonard Spears, in prison in New York at the time, introduced Blackie to the cocaine business. Leonard and his cellmate, Jose Navarro, conducted the business on the outside through Navarro's wife. Blackie made frequent trips to Florida, New York, and Texas to buy cocaine in varying amounts, the largest of which was 10 kilos. These trips usually took three to four days. Spears told the source his weekly cocaine sales netted approximately $100,000.00.

During this meeting Casella learned the identity of the source, who expressed fear for herself and her family. She informed Casella that she did not want to testify, only to alert the authorities to Spears's and Curran's drug activities. She herself was not involved in those activities, she merely had knowledge of them.

Casella spoke with the source again on August 30. The source informed Casella that Spears and Curran were on their way back from Texas, traveling through Arkansas. She thought they would be in Illinois within six to eight hours. Again, on August 31, Casella spoke with the source. On this occasion she told Casella that Spears and Curran were still on their way to Peoria with the cocaine, and would probably arrive by nightfall. She related that Spears said he would feel more comfortable driving at night because the black car would blend into the darkness.

Casella then met with several agents in the drug task force, including Federal Bureau of Investigation ("FBI") Special Agent John Leuck, and relayed the information the source gave her. Leuck had the agents set up surveillance at various points leading into the Peoria area. Agents also searched unsuccessfully in the Peoria area for the black Peugeot.

Leuck compared the information the source provided with information provided to police agencies by other confidential sources, and with the statement Kim Curran gave to Schofield on July 14. Based on all of that information, Leuck determined that if agents observed Spears and Curran driving after dark in a black Peugeot on a main artery leading into Peoria, there was probable cause to believe they had narcotics in the car.

At 9:11 that evening, while stationed near the intersection of Routes 121 and 9, ISP Agents Kabat and Taylor, and MEG Director Schofield, saw a black Peugeot slow down as it approached the stop sign at that intersection. Curran was driving, Spears was in the front passenger seat. Curran saw Schofield and, apparently recognizing him, sped away from the intersection. The Peugeot headed northbound on Route 121, at times reaching speeds of between 75 and 85 miles an hour.

FBI Agent Steven Veyera was in position at the intersection of Route 121 and Queenswood Road. Within minutes, he saw Curran and Spears in the Peugeot, traveling fast. The car braked abruptly and turned onto Queenswood without signalling. The car then sped for about 200 yards and made another abrupt turn, again without signalling, into a shopping center parking lot. Veyera followed in his vehicle and requested that an officer in a marked Tazewell County Sheriff's patrol car stop the Peugeot. He complied and stopped the Peugeot.

Veyera, along with the other agents present, approached the Peugeot and asked Spears and Curran to get out. Veyera and Leuck then searched it. In the passenger area they found a radio pager and a small amount of cocaine. In the trunk, they found a kilo of cocaine and $23,000 in cash. They arrested Spears and Curran and seized the Peugeot.

The following day, as Veyera worked in the Peoria FBI office processing the evidence seized, a voice came over the radio pager: "Blackie, call Don. 676–6519. Blackie, call Don. 676–6519." Veyera called the number, and a man whose voice

sounded the same as that on the pager answered. The man identified himself as Don, and said he needed "two of them," and he had a "pick up," too. Don then gave Veyera his address.

Veyera believed that the purpose of Don's call was to order two ounces of cocaine. He knew that Spears dealt in ounces, and that he had numerous customers who purchased cocaine by the ounce. Veyera also knew that Spears's customers used the pager system to contact him. Consequently, Veyera instructed undercover agents Kabat and Halligan to drive the black Peugeot over to meet with Don.

Kabat and Halligan went to the address Don gave. Kabat knocked on the door of Apartment A, and asked the woman who answered if Don was there. Defendant Donald Meeks appeared in the doorway of Apartment B, stating that he was Don. Kabat asked if he was the one who wanted two ounces. Meeks replied, "yeah." Meeks asked Kabat to come inside the apartment, but Kabat refused. Then Meeks told Kabat to "go get it." Meeks went inside and Kabat returned to the car.

Shortly, Meeks came out onto the porch of the apartment house and motioned for Kabat to come to the porch. He was irate, and told Kabat that he and Blackie never did business in front of the house before. Meeks had a blue paper sack in his hand, which he handed to Kabat. Kabat told Meeks he had some good pot in the car for sale; Meeks responded that he wanted two ounces of "cane." Kabat returned to the car with the sack and handed it to Halligan, who was sitting in the passenger seat. Halligan spilled the contents of the bag onto his lap. It contained bundled amounts of money. Kabat then went to the trunk and pretended to remove cocaine from the car.

Meeks walked off the porch over to the car and complained to Halligan that, "Blackie and me never done business in front of my porch before." Kabat then approached Meeks and handed him a bag, saying "Here is your coke." When Meeks took the bag, Kabat and Halligan arrested

him. The purchase price of the cocaine was never discussed.

After the arrest, Halligan accompanied Meeks into his apartment so he could get dressed. While in the apartment Halligan saw a heat sealer in the living room and numerous plastic bags laying on the couch and the coffee table. The heat sealer was turned on and hot. Later that day, after obtaining a warrant, agents returned and searched the apartment. They found $1,100 in the couch, several small plastic bags, and an empty jar of mannitol.

On September 2, Veyera went to Spears's residence and seized a second Peugeot, this one silver in color. Inside the car he found a receipt for the radio pager, a note pad, and a telephone bill. Meeks's name and telephone number appeared in the items taken from the silver Peugeot, as well as in items found in Spears's wallet on August 31.

At Meeks's trial, Halligan was qualified as an expert witness on cocaine distribution. He testified that drug dealers use pagers to communicate; the term "pick up" can mean to pick up drugs or money; the term "cane" is slang for cocaine; drug dealers use a heat sealer to package their drugs; mannitol is an adulterant used to increase the weight of the cocaine; and, in established drug relationships, drug prices often are set before the deal.

Linda Rupp, Meeks's former girlfriend, also testified at his trial. She recounted that after she moved into Meeks's apartment in January of 1988, she received telephone calls for him wherein the caller would ask for "15" or "20." People also came to the apartment door and asked Meeks for "10" or "15," and then would go inside with him. On occasion, Rupp also went inside and saw Meeks hand these people small packages containing white powder and, in return, they would hand him money. Although Meeks was not employed, Rupp saw him with two to three thousand dollars. Once, in July when cleaning the apartment, she found two small plastic bags that contained a white powdery substance.

Rupp first met Spears in June or July at the apartment she shared with Meeks. Spears came there three times to meet with Meeks. Each time he brought a paper sack with him, which he gave to Meeks, and each time Meeks gave Spears a bag containing money. During one of these meetings, Rupp overheard Spears tell Meeks that the cocaine's quality was high. Meeks responded he would contact Spears in a few days.

Once, Rupp observed Meeks remove a white, brick-shaped substance, wrapped in tin foil, from the sack Spears delivered. Meeks tasted the substance, then used an electric grinder to turn it into powder. He then packaged the powder in small plastic bags that he sealed with the heat sealer. Once packaged, Meeks marked each bag with the numbers "5, 15, 20, 30, 35, 100," and placed them in a brown paper sack. Meeks called a cab and left with the sack. On a couple of occasions Rupp drove Meeks to a local housing project. Once he directed her to hand the packets to persons who approached the car asking for cocaine.

A federal grand jury indicted Spears, Curran, and Meeks on September 21, 1988. Count one charged all three with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Counts two and three charged Spears and Curran with distribution of cocaine and possession with intent to distribute, both in violation of 21 U.S.C. § 841(a)(1). Meeks was charged in count four with using a telephone to facilitate a drug felony, in violation of 21 U.S.C. § 843(b), and in count five with attempt to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846. On April 19, 1989, the grand jury returned a superseding indictment against all three defendants containing the same charges.

On the morning set for his jury trial, May 4, 1990, Spears pleaded guilty to count three, possession of cocaine with intent to distribute pursuant to an oral plea agreement, but reserved the right to appeal the district court's denial of certain pretrial motions. On May 5, 1990, pursuant to a written plea agreement, Curran pleaded guilty to the conspiracy charge contained in count one. On July 19, 1990, a jury convicted Meeks of all the charges contained in counts one, four and five.

The district court sentenced Spears on September 21, 1989, to 212 months imprisonment and four years of supervised release. He appeals both his conviction and his sentence. On December 28, 1989, Meeks was sentenced to concurrent terms of 48 months on count four and 210 months on counts one and five. He also appeals his conviction and sentence. Curran was sentenced on September 21, 1989, to 48 months imprisonment. The government appeals Curran's sentence. All parties filed timely notices of appeal. We will discuss each appeal, and the issues raised, in turn.

## II. Spears's Appeal

### A. *Probable Cause to Search*

Spears's first argument is that the district court erred when it denied his motion to quash his arrest and suppress the evidence recovered from his automobile. He contends that the drug agents lacked probable cause, a warrant, or consent to search, and as a consequence, the search and his subsequent arrest were illegal.

Warrantless, nonconsensual searches of motor vehicles in use on public highways do not violate the Fourth Amendment if the officers conducting the search have probable cause to believe the vehicle contains contraband. *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 2069–70, 85 L.Ed.2d 406 (1985). The issue here, then, is whether the agents who searched Spears's car had the requisite probable cause. Our standard of review of Fourth Amendment probable cause cases, however, has become the subject of much discourse, culminating in complete confusion:

There exists a difference of opinion among the judges of this court as to the appropriate standard of review applicable to Fourth Amendment determinations of probable cause and reasonableness. In reviewing a judicial officer's finding of probable cause for issuance of a search

warrant, this court has limited review to a determination of "whether there was a substantial basis for finding probable cause." Some judges, however, have expressed their disagreement with that approach. In reviewing Fourth Amendment determinations of probable cause and reasonableness in the nonwarrant context, this court has verbalized conflicting standards of review. On some occasions, this court has stated that "a district court's denial of a motion to suppress evidence will not be disturbed unless the decision was clearly erroneous." On other occasions, this court has explained that legal determinations made in a suppression hearing, such as the question of whether circumstances found by a district court meet the Fourth Amendment standard of reasonableness, are subject to de novo review.

*United States v. Holifield,* 956 F.2d 665, 667 (7th Cir.1992) (citations omitted); *see also United States v. Burrell,* 963 F.2d 976, 986 (7th Cir.1992). Because the *Holifield* court concluded that the search in that case could withstand either deferential or plenary review, it declined to resolve the issue. *Id.* at 667. Although we come to the same conclusion about the search here, we will address, and announce, the correct standard of review. For the reasons that follow, today we determine that Fourth Amendment warrant *and* nonwarrant cases [1] both are subject to review for clear error.[2]

Our starting point is *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In that case the Court abandoned what it characterized as "an elaborate set of legal rules that have developed among various lower courts" when reviewing probable cause determinations in warrant cases. *Id.* at 229, 103 S.Ct. at 2327–28. In place of this elaborate set of legal rules, the Court adopted a "totality of the circum-

stances" approach, *id.* at 230, 103 S.Ct. at 2328, explaining that review of the quantum and quality of evidence purporting to establish probable cause necessarily is factbound. Consider: " 'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Id.* at 231, 103 S.Ct. at 2328 (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). Further, the evidence supporting probable cause "must be seen and weighed not in terms of library analysis by scholars but as understood by those versed in the field of law enforcement." *Id.* 462 U.S. at 232, 103 S.Ct. at 2329 (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). And finally, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a set of legal rules." *Id. Gates* instructed reviewing courts on the form that review of a magistrate's probable cause determination should take, and we can have no clearer mandate: "we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit [establishing probable cause] *should not take the form of* de novo *review.*" *Id.* 462 U.S. at 236, 103 S.Ct. at 2331 (emphasis ours). Instead, a reviewing court should review the magistrate's determination deferentially. *Id.* Its only duty is to ensure that the issuing magistrate had a "substantial basis" to conclude that probable cause existed. *Id.* at 238–39, 103 S.Ct. at 2332–33.

Nonetheless, the majority in *United States v. McKinney,* 919 F.2d 405 (7th Cir. 1990), concluded that by this language the Court created an intermediate, "substantial

---

1. Although the search of Spears's automobile was conducted without a warrant, we nonetheless also resolve the standard of review applicable to warrant cases as well. We will then apply that standard in part III.B. of this opinion, which concerns the search, pursuant to a warrant, of co-defendant Meeks's apartment.

2. Because this decision changes the law of this circuit, we have circulated this opinion to all active judges of this court pursuant to Circuit Rule 40(f). A majority of the judges has voted not to rehear the case en banc. Judges Cummings, Cudahy, Flaum, and Ripple voted to rehear.

basis," review in warrant cases: something more deferential than *de novo*, but less deferential than clear error. *Id.* at 408–09. We think the *McKinney* majority misunderstood *Gates*. As the concurring opinion points out, *Gates* itself does not discuss "substantial basis" as an intermediate review between deferential and plenary. Indeed, the concurrence asks "how the Court's directive in *Gates* that we give 'great deference' to the magistrate's finding can be squared with a rule that gives that finding less deference than we would give an ordinary finding of fact." *McKinney*, 919 F.2d at 421 (Posner, J., concurring). The concurrence suggests that " '[s]ubstantial basis' sounds like 'substantial evidence,' the formula for judicial review of administrative factfindings—a formula usually thought, if anything, more deferential than the standard of clear error is." *Id.* at 423.

But the Court *has* used the term "substantial evidence." A year after *Gates*, the Court commanded that "a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 2085–86, 80 L.Ed.2d 721 (1984) (per curiam). That is a factual review, plain and simple, which we conduct with deference. Unfortunately, considerably less attention has been paid to the *Upton* Court's use of "substantial evidence" than the *Gates* Court's use of "substantial basis." Nonetheless, we have been instructed, more than once, *not* to review a magistrate's probable cause determination *de novo*, but deferentially. Because, even reading between the lines, we do not discern a third standard of review announced in *Gates*, we conclude today that in warrant cases our review must be for clear error. Anything more would be a return to the "elaborate set of legal rules" the Court eschewed in *Gates*.

We move now to nonwarrant cases, which we have said raise a mixed question of law and fact. Under our former standard this mixed question would require us to review the district judge's factual findings deferentially, and conduct a *de novo* review of his legal conclusions. *See United States v. Ramos*, 933 F.2d 968, 972 (11th Cir.1991). *See also McKinney*, 919 F.2d at 412. The question in both cases, however, is the same: did probable cause exist. The Court tells us that "[p]robable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). It is a legal conclusion, dependent solely on a factual analysis: the facts are what the police knew and did; the finding of probable cause is a conclusion that those facts meet the legal criteria for probable cause. So the question for us is whether this finding should be reviewed deferentially, as ordinary findings of fact are, or *de novo*, as ordinary legal rulings are.

To answer that question, we turn once again to *Gates*, and repeat language we have already quoted: "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a set of legal rules." 462 U.S. at 232, 103 S.Ct. at 2329. As we read *Gates*, we review the magistrate's probable cause determination deferentially. The *McKinney* concurrence notes that is a determination the magistrate makes in an *ex parte* proceeding. It would be anomalous to require a more searching review of a district judge's probable cause determination, made after a full adversary proceeding. *McKinney*, 919 F.2d at 422. Because there is little to distinguish a magistrate's probable cause determination in a warrant case and a district judge's probable cause determination in a nonwarrant case, appellate review should be the same for both. In warrant cases, the magistrate is the front-line judicial officer making the initial deter-

mination. In nonwarrant cases, it is the district judge who makes the initial determination, who asks the same question the magistrate asks in a warrant case: is there probable cause. If there is probable cause, the scope of the search without a warrant is no greater than one with a warrant: it " 'is defined by the object of the search and the places in which there is probable cause to believe that it may be found.' " *California v. Acevedo,* —— U.S. ——, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991) (quoting *United States v. Ross,* 456 U.S. 798, 824, 102 S.Ct. 2157, 2172–73, 72 L.Ed.2d 572 (1982)). In both cases, if there is probable cause, the search is reasonable and does not violate the Fourth Amendment. If there is no probable cause, the factfinder at trial will not consider the evidence, either because the warrant did not issue, or the exclusionary rule operates to keep it out. It is the front-line judicial officer in both cases who conducts the initial inquiry, who concludes there is or is not probable cause, and an appellate panel should not substitute its judgment in either case.

■ Lest we be accused of scuttling the Fourth Amendment, we hasten to point out that although warrantless searches are presumptively unreasonable, there are exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The exceptions include searches based on probable cause, consent and exigent circumstances. *United States v.*

*Karo,* 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984). Thus, like searches pursuant to a warrant, searches based on one of those exceptions are not presumptively unreasonable and do not violate the Fourth Amendment. All we are doing today is announcing one standard of review for all reasonable searches. This is not as big a step as it appears at first blush. We already review exigent circumstances cases for clear error. *See, e.g., United States v. Sewell,* 942 F.2d 1209, 1213 (7th Cir.1991). The same is true of consent cases. *See, e.g., United States v. Berke,.* 930 F.2d 1219, 1221 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 269, 116 L.Ed.2d 221 (1991). By our action today we simply bring probable cause-based non-warrant cases in line with the rest of our Fourth Amendment reasonable search jurisprudence.[3] And in line with three of our sister circuits, who likewise review probable cause determinations for clear error. *See United States v. Fox,* 902 F.2d 1508, 1513 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990); *United States v. Williams,* 897 F.2d 1430, 1435 (8th Cir.1990); *United States v. Santana,* 895 F.2d 850, 852 (1st Cir.1990).[4]

■ Here, the district judge correctly followed the *Gates* "totality of the circumstances" approach. He "looked at all of these various component parts [to see] if in wrapping all of this together it rises to the level of probable cause." Transcript of

---

**3.** Language in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), suggests to us that all cases involving exceptions to the presumed unreasonable rule should be reviewed under the same fact-intensive analysis: "It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given [warrantless] search was supported by *probable cause or exigent circumstances* will often require examination of the information possessed by the searching officials." *Id.* at 641, 107 S.Ct. at 3039–40 (emphasis ours).

**4.** Although we hesitate to call this a trend, we note that the remaining circuits now review one or the other of the exceptions cases for clear error: *United States v. Lopez,* 937 F.2d 716, 722 (2d Cir.1991) (exigent circumstances); *United States v. Antoon,* 933 F.2d 200, 204 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 300, 116

L.Ed.2d 243 (1991) (consent); *United States v. Reed,* 935 F.2d 641, 642 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 423, 116 L.Ed.2d 443 (1991) (exigent circumstances); *United States v. Vasquez,* 953 F.2d 176, 179 (5th Cir. 1992) (exigent circumstances); *United States v. Winfrey,* 915 F.2d 212, 218 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991) (consent); *United States v. Preciado–Robles,* 954 F.2d 566, 569 (9th Cir.1992) (consent); *United States v. Valdez,* 931 F.2d 1448, 1451 (11th Cir.1991) (consent); *United States v. Lewis,* 921 F.2d 1294, 1301 (D.C.Cir.1990) (consent).

We also note that other, mixed questions equally as fact-dependent, such as whether certain conduct amounts to negligence, or a pleading is frivolous under Rule 11, are reviewed for clear error. *See McKinney,* 919 F.2d at 419 (Posner, J., concurring) and *United States v. Malin,* 908 F.2d 163, 169 (7th Cir.1990) (Easterbrook, J., concurring).

Hearing on Motions ("Tr.") on March 3, 1989 at 508. The judge did find it troublesome that nothing in the record established the source's veracity or the basis of her information. Lacking that information, the judge noted that the agents did what any reasonable and prudent law enforcement officer would do: they sought corroboration. They compared the background information the source provided about Spears's drug activities to both Curran's statement to Director Schofield on July 14 and information provided by other Operation Iron Eagle sources, and found that they corresponded. They also were able to corroborate that Spears had access to a black Peugeot and that during the time the source claimed Spears and Curran were traveling back to Peoria the car could not be located at its registered address. Nor was it observed anywhere in the Peoria area. Finally, the agents were able to corroborate the information the source gave regarding what would occur on August 31 simply by sitting and waiting to see if this specific car, containing these specific individuals, would approach the Peoria area from the south, within a given time-frame after dark.

The district judge concluded that the confluence of all of these facts provided the agents with probable cause. As the Supreme Court wrote in *Gates*, "It is enough, for purposes of assessing probable cause, that '[c]orroboration through other sources of information reduced the chances of [the informant telling] a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" *Id.* 462 U.S. at 244–45, 103 S.Ct. at 2335 (quoting *Jones v. United States*, 362 U.S. 257, 269, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Because we determine that the district judge was not clearly erroneous, the search of the Peugeot and Spears's subsequent arrest were, therefore, both lawful.

B. *Motion to Disclose*

Spears argues that the trial court committed reversible error when it denied his motion to disclose the identity of the confidential source. Spears initially filed this motion on January 3, 1989. The court conducted a two-day hearing, during which defendant argued that there was no legitimate "knowledgeable source," but that the information came from one of the law enforcement members of Operation Iron Eagle. *See* Tr. Jan. 4, 1989 at 70, 72–74, 80, and Tr. Jan. 6, 1989 at 134–35. After hearing the testimony of Assistant United States Attorney Smith and several of the Iron Eagle members (one of whom produced her interview notes from meetings with the source), Spears stipulated that there was, in fact, a legitimate knowledgeable source. Tr. Feb. 8, 1989 at 237. At a later hearing, he withdrew the motion entirely. Tr. Feb. 23, 1989 at 470.

After the grand jury returned a superseding indictment, however, Spears renewed his motion to disclose. Record on Appeal ("Rec."), Document ("Doc.") No. 87. That motion, which does not attempt to withdraw the stipulated fact that there was a legitimate knowledgeable source, raised nothing new. Later, at a pretrial hearing on motions, defendant also raised nothing new in support of this motion, except that his counsel offered for the court's consideration an article concerning police misuse of a confidential informant in Boston. Tr. May 4, 1989 at 3. The article, according to defense counsel, detailed a case where police officers obtained knowledge from various sources and then planted that information with one person they called a confidential source, who then fed back to them that same information in order to provide them with probable cause to conduct searches. Acknowledging the difficulty in proving this assertion, defense counsel suggested that in this case certain inferences could be drawn from the article. *Id.* at 6. Of course, the inference Spears sought was that there was no legitimate knowledgeable source, that Iron Eagle members supplied the information to a third person who parroted it back to them, establishing probable cause to search the Peugeot.

■ The district court denied the renewed motion, and we see no error in its ruling. Although arguing that nondisclosure of the confidential source denied him his constitutional right to confront and

cross-examine witnesses against him, the focus of Spears's motions to disclose was the nonexistence of the source. When faced with overwhelming evidence of her existence, however, Spears stipulated that there was in fact a confidential source. When he did that, the existence of the confidential source became a found fact. Absent any newly discovered facts material to the case against *him*, the existence of the confidential source remains a found fact. Inferences drawn from an article about police misuse of a confidential source in Boston do not rise to the level of newly discovered facts. Consequently, Spears cannot now withdraw the stipulation.

■ As to his claim that nondisclosure denies him his constitutional right to confront and cross-examine the confidential source, *United States v. Roviaro*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), instructs us that, "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the [informer's] privilege must give way." *Id.* at 60–61, 77 S.Ct. at 628. We require a defendant seeking disclosure to establish a genuine need, something beyond the naked assertion of his right to confront and cross-examine. *United States v. Andrus*, 775 F.2d 825, 842 (7th Cir.1985). Here, Spears made no showing whatsoever of a genuine need for the identity of the confidential source. As in *United States v. Rugendorf*, 376 U.S. 528, 535, 84 S.Ct. 825, 829–30, 11 L.Ed.2d 887 (1964). Spears has failed to develop the necessary criteria for disclosure. And, as in that case, we cannot say that on the record before us the identity of the informant was essential, relevant, or helpful to his case. *Id.*

### C. *Sentencing Challenges*

■ Spears raises three challenges to his sentence: the judge erred in his (1) calculation of the amount of cocaine for which Spears was responsible under the Sentencing Guidelines's relevant conduct provisions; (2) failure to reduce Spears's adjusted offense level for acceptance of responsibility; and (3) four point increase in Spears's base offense level because of his role in the offense. Initially, we note that these challenges are to the district court's factual determinations, which we will disturb only if clearly erroneous. *United States v. Bafia*, 949 F.2d 1465, 1479 (7th Cir.1991); *United States v. Cagle*, 922 F.2d 404, 406 (7th Cir.1991). Spears's challenges can succeed only if we are left with the definite and firm conviction that a mistake has been made. *Cagle*, 922 F.2d at 406. We note that in each instance of controverted facts, the district judge adopted the Presentence Report's ("PR") findings as his own, making his reasons clear on the record, as well as attaching a written Statement of Reasons to the PR. *See* Rec. Doc. 149. This is permissible. *United States v. Musa*, 946 F.2d 1297, 1308 (7th Cir.1991).

■ His first challenge is to the amount of cocaine for which he was held accountable. The PR states that Spears's

> base offense level is based on the quantity of cocaine found in the vehicle at the time of the arrest (1,011.86 grams), the cocaine sold on June 10, 1988 (1.8 grams), the cocaine sold on June 21, 1988 (23.16 grams), and the 4 kilograms of cocaine he picked up in Florida.

PR at 16. Spears objects to the inclusion of the four kilograms, claiming there was insufficient evidence to prove his involvement with this amount of cocaine. In overruling Spears's objection below, the judge stated he based his ruling specifically on the testimony of co-defendant Curran. Transcript of Sentencing Hearing ("Sen. Tr.") at 77–78. At his sentencing hearing, Curran testified about her two-year long, cocaine-based relationship with Spears. During their association, she accompanied him to Florida on three occasions. On the first occasion, Spears obtained a kilogram of cocaine, which he brought back to Peoria. Sen.Tr. at 26–27. On another trip to Miami, although Curran saw only one kilogram, Spears told her he had three. Sen. Tr. at 28. So it all boils down to Curran's credibility. The judge stated

I think Curran's testimony in regard to this matter is believable....

I recognize that she has an interest in this and I factor that in, but I am not aware of anything that would indicate to me that her testimony regarding these four kilograms is inherently unreliable. I think the Government has met their burden regarding that point.

Sen.Tr. 70, 78–79. We have reviewed the testimony and arguments presented at the sentencing hearing, and from that see no clear error in this finding.

■ We also see no clear error in the judge's failure to afford Spears a two-level reduction for acceptance of responsibility. The probation officer stated in the report that Spears had not "clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." Rec. Doc. 115 at 15. During the entire course of the proceedings before him in this case the judge had the opportunity to observe the defendant, and thus was particularly well-suited to assess whether Spears accepted responsibility for his conduct. At the sentencing hearing, the judge stated that,

[Spears] did plead guilty. My understanding of his testimony this morning is that yes, he did get amounts of cocaine and he did sell them, but that basically— even as of his testimony this morning— that he never did that prior to meeting Kim Curran and that basically that is what motivated him to do this and I simply don't accept that.

. . . . .

I simply do not think that his plea of guilty here is indicative of any real acceptance of responsibility on his part. I believe that—I don't think that he really believes what he said in his mind this morning. I think the evidence establishes that he was selling cocaine before he met [Curran], so I'm going to deny the objection....

Sen.Tr. at 79–80. There is nothing in the record that leaves us with the definite and firm conviction that a mistake has been made as a result of this finding.

■ Finally, Spears challenges the district court's four level increase to his base offense level for his role in the offense. The Guidelines permit a four level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive...." U.S.S.G. § 3B1.1(a). Summarizing the evidence presented during the sentencing hearing, the judge stated

I do think that the evidence points to a situation where Mr. Spears would go out of town, buy cocaine, come back, and the method of distribution of that was that he sold to a number of people, some of whom bought it for their own use only and some of whom bought it for their own use plus for resale.

It's clearly established, I believe, that the defendant did distribute cocaine to Kim Curran on at least one occasion where it was resold, the June 21st incident. We know about the Donald Meeks matter and I think he clearly qualifies under that. There is evidence in the record regarding Casey and Remillard relying on him as a source and that they used the drugs to resell. We have Curran's testimony that there were several people that she knew of that purchased drugs from him for resale.

Sen. Tr. at 72. All of that, coupled with Spear's pager system of distribution, satisfied the district judge that he qualified for the four level increase. Sen.Tr. 73. Based on the record before him, we see no clear error in the district judge's increase pursuant to section 3B1.1(a).

### III. Meeks's Appeal

#### A. *Right to Counsel of Choice*

■ Meeks's first argument is that the district judge committed reversible error when he removed his attorney, Ronald Halliday, from the case because of a conflict of interest. This, he contends, was a violation of his Sixth Amendment right to counsel of his choice. We recognize that there is

a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a show-

ing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

*Wheat v. United States,* 486 U.S. 153, 164, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140 (1988). Our review of the district court's decision to remove Meeks's counsel is thus deferential—we will reverse only for abuse of discretion. *United States v. Defazio,* 899 F.2d 626, 629 (7th Cir.1990).

 We begin our inquiry, however, by examining for clear error the district court's factual findings that a conflict existed. *Id.* During the course of pretrial discovery, Halliday became aware that Linda Rupp, one of the government's witnesses, made statements to an FBI agent concerning Meeks's involvement in drug trafficking that were inconsistent with statements she made to him. Faced with the possibility of having to testify in order to impeach the witness, Halliday notified the judge of the potential conflict. He explained that he discussed the situation with Meeks, who nonetheless insisted he wanted Halliday to continue as his attorney. After exploring the nature of Rupp's testimony, the judge addressed the defendant, cautioning him that his insistence that Halliday continue "could effectively significantly limit[ ] your ability to impeach the testimony of a witness who may well be—in terms of your case—the most important prosecution witness." Tr. Apr. 6, 1989 at 4–5. The judge asked both counsel to assess the importance of Rupp's testimony. The prosecutor stated that she "probably is the government's most important witness at this point." *Id.* at 10. Halliday acknowledged that Rupp's statement to the FBI "is very damaging to the defendant." *Id.* at 11. As a result, the judge stated,

> Then I think under those circumstances I have no choice but to say that there is a conflict of interest here, an actual conflict of interest. I believe under the cir-

cumstances because you are a potential witness in the case and the testimony that you would give, if called to testify, would involve something that is not a matter that is not in dispute. It is something I assume that would be hotly disputed.

*Id.*

We see no error in this finding. Under the Illinois Code of Professional Responsibility, adopted by the United States District Court for the Central District of Illinois as its own legal ethics code,[5] the then-applicable rule required, in pertinent part,

> If a lawyer learns after undertaking employment in contemplated or pending litigation, or if it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and neither he nor his firm, if any, shall continue representation in the trial....

Code of Professional Responsibility Rule 5–102(a), Ill.Rev.Stat. ch. 110A, Canon 5 (repealed 1990).[6] It could not be more clear that Halliday suffered from a conflict under this rule in that he "ought to be called as a witness on behalf of his client."

 So we turn to the district court's decision to remove Halliday from the case. Before ruling on the effect of the conflict, the judge noted that Halliday would not need to be disqualified if Rupp would admit that she made inconsistent statements. Consequently, he set the matter over for a hearing, at which Rupp testified that she did make statements to Halliday that were inconsistent with those she made to the FBI agent. She denied, however, that she told Halliday that the agent threatened her with the loss of her job or prison if she refused to cooperate. After she left the courtroom, Halliday proffered that Rupp told him that FBI agents threatened her to secure her cooperation. In response to the judge's question, counsel stated that if

---

5. *See* Rule 2(D) of the Rules of the United States District Court for the Central District of Illinois.

6. Effective August 1, 1990, the Illinois Supreme Court replaced the Code of Professional Responsibility with the new Illinois Rules of Profes-

sional Conduct ("IRPC"). The corresponding rule under the IRPC is essentially unchanged. *See* Illinois Rules of Professional Conduct, Ill.Rev. Stat. ch. 110A, Rule 3.7 (1989).

called, he would so testify. Before proceeding further, Halliday requested a moment to consult with his client, after which Halliday informed the court that Meeks continued to want his representation.

The judge then addressed the defendant, informing him that if Halliday continued with the case he would not be able to testify regarding Rupp's statement to him of FBI threats. The judge offered his opinion that Rupp's testimony was a significant matter, that she was an important prosecution witness, and that Meeks's inability to call Halliday as an impeachment witness could significantly affect whether the jury believed her. Meeks responded, "I have decided to keep Mr. Halliday whatever the consequences. I don't want no other attorney to defend me. I decided to keep Mr. Ron Halliday, whatever consequences. I do not want any other attorney defending me." Tr. May 8, 1989, at 21. The judge, attempting to make certain Meeks understood those consequences, offered, "You understand that ... what you are asking the Court to do is to allow you to waive this conflict of interest...." *Id.* at 22. Meeks responded he understood. Nonetheless, in ruling, the judge stated

> As I said at a previous hearing, anytime that a question like this comes up, the Court is faced with two competing rights: number one, the right of a defendant to choose the lawyer who is going to represent them, that competes with a right to effective assistance of counsel. While I certainly am one who has always taken the position that people can, within reason, waive rights that they might otherwise have, in the context of this type of criminal case with my understanding of the issues in this case and the importance of this witness to the prosecution, and in that context the importance of the jury's assessment of her credibility and the reasons for her testimony, to say that the defense would be precluded from presenting a witness who could testify under oath that this witness told them that the reason—or told them that she

had been threatened, that if she didn't cooperate she would be arrested, be placed in prison, et cetera, to say that the defense would be precluded from that is frankly something that I don't think this defendant is fully capable of understanding in terms of its ramifications.

> I have in the past in a variety of situations allowed criminal defendants to waive various types of conflicts of interest, depending on the circumstances. This one is so central to the issues of this case that in view of my recognition of it as an actual conflict, I do not believe that it can effectively be waived.... So I am going to remove you from the case.

*Id.* at 25–26.

Meeks argues that the district court's refusal to allow him to waive his right to conflict-free counsel impinged his constitutional right to counsel of his choice. He overlooks, however, that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697. Further, the Court stated "where a court justifiably finds an actual conflict of interest, there can be no doubt it may decline a proffer of waiver...." *Id.* at 162, 108 S.Ct. at 1698. In view of the conflict here, the seriousness of which was not lost on the district court, we do not believe it abused its discretion when it disqualified Halliday as Meeks's trial counsel.[7]

B. *Motion to Quash Search Warrant*

Meeks's argument regarding the search warrant FBI agents obtained to search his residence is two pronged. First, he claims the affidavit in support of the warrant fails to establish probable cause. Second, he contends that because the warrant fails to

---

7. We note that as events developed at trial, after the government rested, Meeks's sole defense witness was Ronald Halliday, whose testimony was offered to impeach that of Linda Rupp. *See* Transcript of Trial, July 18, 1989, at 208–223.

particularize the items to be seized it is defective.

As we stated in part II.A., we conduct a deferential review of a magistrate's probable cause determination. The affidavit before the magistrate in this case states that the affiant received certain information from "fellow federal and state law enforcement agents." That information recounted the events of August 31, 1988, and September 1, 1988, beginning with the arrest of Charles Spears, the seizure of Spears's pager, the message agents received from "Don" over the pager, the simulated sale of cocaine to Meeks, and his arrest. The affiant further stated the agents related having seen very specific items commonly used to package controlled substances in Meeks's living room when they accompanied him to his apartment to allow him to change clothes. *See* Affidavit, Rec.Doc. No. 61. Based on that information, the affiant believed drug paraphernalia, packaging material, and controlled substances would be found inside the apartment.

▆▆▆▆ Meeks claims that the affidavit fails to establish probable cause because it lacks any indicia of reliability of the information provided by the federal and state law enforcement officers, or the basis of their knowledge. Meeks complains that the affidavit fails to set out the agents identities, their training and experience in drug cases, or that they were participating in a joint investigation with the affiant. Meeks's argument, however, is an effort to engage us in a technical review of the supporting affidavit, rather than the practical, common sense approach *Gates* dictates. In determining whether probable cause exists, a magistrate is entitled to regard an affiant's fellow law enforcement officers as reliable sources. *See United States v. Griffin*, 827 F.2d 1108, 1112 (7th Cir.1987), *cert. denied*, 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988); *United States v. Pritchard*, 745 F.2d 1112, 1120 (7th Cir.1984). Considering the "totality of the circumstances" recited above, there is nothing clearly erroneous here about the magistrate's determination that probable

cause existed to support the issuance of a search warrant for Meeks's apartment.

▆▆▆▆ The second prong of Meeks's attack on the warrant is that it is overbroad and permits seizure of items unrelated to violations of the drug abuse prevention laws with which he was charged. He maintains the warrant's language is open-ended and, therefore, prohibited by the Fourth Amendment. Unquestionably, the Fourth Amendment's guarantee against unreasonable searches and seizures proscribes general or open-ended warrants. *United States v. Brown*, 832 F.2d 991, 996 (7th Cir.1987), *cert. denied*, 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 243 (1988) (citing *Dalia v. United States*, 441 U.S. 238, 255, 99 S.Ct. 1682, 1692, 60 L.Ed.2d 177 (1979)). The officers executing the warrant must be able to identify the things to be seized with reasonable certainty. *Id.* A catch-all phrase will not invalidate a warrant "as long as it sufficiently limits the discretion of the officers in executing the warrant." *Id.*

The warrant here permitted a search for, and seizure of, "controlled substances and other drug related paraphernalia, and materials for packaging controlled substances." Search Warrant, Rec.Doc. No. 61. The terms "controlled substances" and "materials for packaging controlled substances" are sufficiently specific on their face. The catch-all term "other drug related paraphernalia" also passes constitutional muster in that such items are easily identifiable and quickly found by drug law enforcement officers. A search warrant delineating those items generally, in combination with named contraband, sufficiently limits an officer's discretion to execute the warrant. *Cf. United States v. Reed*, 726 F.2d 339, 342 (7th Cir.1984) (search for any other papers indicating "proof of residency" not unconstitutional when coupled with a search for other named contraband, and when "easily recognizable, quickly found, and does not authorize a general search of personal papers."). The warrant, therefore, does not fail; Meeks's arguments do.

### C. Upward Departure from Sentencing Guidelines

At his sentencing hearing, the district court found that Meeks's criminal history category did not adequately reflect the seriousness of his prior criminal history. Consequently, the court departed upward from the Sentencing Guidelines and sentenced Meeks on counts one and four to 210 months incarceration. Meeks assigns as error the court's departure, and contends that its calculation of 210 months was unreasonable.

▮▮▮▮ Upward departure from the Sentencing Guidelines is permissible if, after a proper calculation of a defendant's base criminal history category, the district court concludes that the base level does not reflect the seriousness of the defendant's past criminal conduct or his potential for future criminal conduct. *United States v. Scott,* 914 F.2d 959, 965 (7th Cir.1990). In reviewing a trial court's departure from the Guidelines, we begin with a *de novo* review of the court's stated grounds to ascertain that they are of a kind that may be relied on to justify a departure. *United States v. Lewis,* 954 F.2d 1386, 1396 (7th Cir.1992). If they are, we then review the facts underlying the departure, and will reverse the district court only if its factual findings were clearly erroneous. *Id.* Finally, we review the degree of departure to determine if it was reasonable, giving "considerable leeway to a sentencing court's determination of what Criminal History category most accurately reflects the defendant's actual criminal history." *Id.* (citing *United States v. Williams,* 901 F.2d 1394, 1396–97 (7th Cir.1990)). *See also* 18 U.S.C. § 3742(e)(3). When a defendant's criminal history category is, as here, Category VI (the highest level), the amount of the departure must be related to the structure of the Guidelines. *Scott,* 914 F.2d at 963.

So we turn to the sentencing hearing. The judge grounded the departure on two provisions of the Sentencing Guidelines, sections 4A1.3 and 5K2.14. Specifically, he stated that Meeks's criminal history category did not adequately reflect the serious-

ness of his past criminal conduct nor the likelihood that he would commit other crimes, and that Meeks is a threat to the public welfare and safety. Sen.Tr. at 49. Meeks complains here that the district court improperly relied on consolidated sentences to justify departure. But as we said in *Williams,* these are appropriate grounds to justify departure. 901 F.2d at 1397–97. *See also* United States Sentencing Guidelines ("U.S.S.G.") §§ 4A1.2 Application Note 3, 4A1.3 & 5K2.14.

▮▮▮▮ As to section 4A1.3, after chronicling Meeks's criminal history, the judge found that Meeks demonstrated by a "consistent pattern of conduct over the years that [he] cannot live for any period of time in society without committing serious crimes." Sen.Tr. at 49. That history commenced in 1955 when Meeks, then 17 years old, was adjudicated a delinquent for burglary. His adult convictions make an impressive list:

- 1957: misdemeanor stealing;
- 1958: second degree assault with intent to rob;
- 1959: burglary;
- 1962: first degree robbery;
- 1966: burglary;
- 1968: exhibiting a deadly weapon;
- 1971: burglary;
- 1972: two consolidated convictions for assault with intent to kill with malice;
- 1975: burglary;
- 1979: two convictions, one for theft, one for burglary;
- 1983: criminal damage to property;
- 1986: two convictions, one for trespass to land, and one for retail theft.

Sen.Tr. at 45–47. The judge then commented that this is a total of fifteen convictions, resulting in Meeks's confinement for 20 out of the past 32 years. *Id.* at 48. As to section 5K2.14, the judge stated that Meeks "fit the classic profile of a career recidivist who will continue to pose a serious threat to the safety of whatever community [he] is living in, either by robbery or burglary or selling drugs." He then found that Meeks is a threat to the public welfare and safety. *Id.* at 50. Based on

the record before us, we see no error in the judge's factual findings.

■ Our only remaining inquiry, therefore, is whether the departure was reasonable and linked to the structure of the Guidelines. The judge stated:

> I have looked at the table and I think that the table would indicate that at a level 26, category VI, your sentence would be in the range of 120 to 150 months. If you were labeled a career criminal here, which I believe you really are, the range would be 262 to 327 [level 34, category VI].
>
> Because there are reasons why you are not labeled a career criminal, I don't think it would be fair to raise you up to that level, so what I'm going to do is put you in the middle between those two ranges. I'm going to raise you from a level 26 to a level 30 and the range for that is 168 to 210 months.

Sen.Tr. at 50. The district court could not label Meeks a career criminal because he did not meet the third requirement under the career offender provisions of the Guidelines: he did not have at least two prior felony convictions for either a crime of violence or a controlled substance within the applicable fifteen year time period. *See* U.S.S.G. §§ 4B1.1 & 4A1.2(e)(3). And the only reason Meeks doesn't have two felony convictions for violent crimes is because he had the good fortune to appear before a judge who consolidated for sentencing purposes two assaults with intent to kill with malice against two separate women in two separate incidents.[8] *See* Presentence Report at 19. But for that consolidation, Meeks would be a career offender. Consequently, we think the trial court's determination to increase Meeks's offense level to a point midway between his base level and that of a career offender was eminently reasonable, and was related to the structure of the Guidelines. We, therefore, affirm the district court's up-

ward departure from the Sentencing Guidelines. *See* 18 U.S.C. § 3742(f)(3).

### D. *Remaining Arguments*

■ Meeks raises a plethora of additional arguments, which are all meritless. For that reason, we will address them in summary fashion. First, he maintains that count one of the superseding indictment is insufficient because it fails to allege how or when he became a member of the conspiracy, or any overt acts attributable to him in furtherance of it. An indictment is sufficient if it adequately apprises the defendant of the charge against him so that he can prepare a defense and plead any judgment which may be rendered as a bar to further prosecution. *United States v. Hinkle,* 637 F.2d 1154, 1157 (7th Cir.1981). If the indictment is brought under 21 U.S.C. § 846, as here, it is sufficient if it alleges a conspiracy to distribute drugs, the time during which the conspiracy was operative, and the statute allegedly violated. *United States v. Sweeney,* 688 F.2d 1131 (7th Cir. 1982). It need not allege *any* overt acts. *United States v. Dempsey,* 806 F.2d 766 (7th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 497 (1987). The superseding indictment here does allege overt acts in furtherance of the conspiracy, which occurred within a specific time frame, all in violation of 21 U.S.C. § 846. *See* Superseding Indictment, Rec., Doc. 84. The indictment, therefore, is sufficient.

As an alternative argument to the sufficiency of the superseding indictment, Meeks argues that the grand jury that returned the indictment did not hear any evidence of his involvement in the conspiracy before the ending date of August 31, 1988. Because he failed to raise this argument in the trial court, it is waived here. *See Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1333 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977).

---

**8.** The incidents occurred on the same day. In the first, Meeks took a pair of garden shears from a 53 year old woman who was doing some yard work. He knocked her to the ground, attempted to tear off her pants and sexually assault her. When she screamed, he stabbed her in the chest. In the second incident, Meeks entered the apartment of a former girlfriend, told her to take off her clothes, and stabbed her in the back with a butcher knife when she refused. Presentence Report at 19.

 Next, Meeks claims the government failed to prove him guilty of conspiracy beyond a reasonable doubt as charged in count one of the superseding indictment. Defendant acknowledges that to be successful in his sufficiency of the evidence argument, he has a high hurdle to overcome: we review the evidence to determine if *any* rational trier of fact could have found him guilty beyond a reasonable doubt. The government need only show the existence of a conspiracy and substantial evidence of defendant's connection to that conspiracy. *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). Meeks fails to clear the hurdle. The trial transcript is replete with sufficient evidence of Meeks's involvement in the conspiracy from which the jury could (and did) conclude he was guilty of conspiracy beyond a reasonable doubt. *See* Meeks's Trial Transcript, Vol. I at 58–70, Vol. II at 16–35, 72–91, 97–118, and 170–196.

Meeks adopts as his own the arguments of co-defendant Spears to quash his arrest and suppress the evidence seized as a result of the search of the black Peugeot on August 31, 1988. Because Meeks has no privacy interest in the Peugeot, he has no standing to challenge the search. *Alderman v. United States*, 394 U.S. 165, 172, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969).

 Finally, Meeks appeals the district court's refusal to reduce his base offense level. At his sentencing hearing, he argued for a two-level reduction under § 3B1.2(b), claiming he was a minor participant in the offense. The district court refused. We will reverse a district court's findings and conclusions under § 3B1.2 only if they are clearly erroneous. *United States v. Brick*, 905 F.2d 1092, 1095 (7th Cir.1990). We are mindful, however, that when the record supports two permissible

views of the evidence, the fact-finder's choice of one view over the other cannot be clearly erroneous. *Id.* Moreover, the determination of whether § 3B1.2 is applicable in a particular case is heavily dependent on the facts of that case. *See* U.S.S.G. § 3B1.2, Commentary.

The sentencing judge here found, based on testimony and inferences drawn from proved facts, that Meeks "was a well-established coke dealer who did engage in a number of coke transactions." Sen.Tr. at 15. He concluded therefrom that Meeks's involvement cannot be "characterized as either minimal or minor." *Id.* Based on the record before the district judge, we cannot say his findings and conclusion were clearly erroneous.

## IV. The Government's Appeal

 At Curran's sentencing hearing, the judge calculated her total offense level as 24 with a criminal history category of II, which resulted in a sentence range of from 57 to 71 months. Without a motion from the government pursuant to either 18 U.S.C. § 3553(e) [9] or section 5K1.1 of the Guidelines,[10] the judge afforded Curran a downward departure for "substantial assistance" to the government, and sentenced her to 48 months. From the bench, and in a later written Memorandum Opinion, the judge found both provisions unconstitutional as violative of substantive and procedural due process. 724 F.Supp. 1239. The government appeals.

We begin by noting that we "regularly treat sections 3553(e) and 5K1.1 as parallels for purpose of analysis." *United States v. Hayes*, 939 F.2d 509, 511 (7th Cir.1991). We end by noting that the substantial and growing body of case law in this circuit firmly establishes that these

---

9. The *statutory language provides in pertinent* part:

Upon a motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or *prosecution of another person who has committed an offense.*

18 U.S.C. § 3553(e).

10. The Guideline language provides:

Upon motion of the Government stating that the defendant has made a good faith effort to provide substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

U.S.S.G. § 5K1.1.

provisions do not violate either a defendant's procedural or substantive due process. *See United States v. Smith*, 953 F.2d 1060, 1064–65 (7th Cir.1992); *United States v. Spillman*, 924 F.2d 721, 724 (7th Cir.1991); *United States v. Donatiu*, 922 F.2d 1331, 1333–34 (7th Cir.1991); *United States v. Valencia*, 913 F.2d 378, 386 (7th Cir.1990); *United States v. Lewis*, 896 F.2d 246, 249 (7th Cir.1990). Unless and until a higher authority rejects our analysis, that is the law of this circuit.

 Absent a § 3553(e) or § 5K1.1 motion by the government, the district court is without authority *sua sponte* to reduce a defendant's statutory minimum sentence. *Smith*, 953 F.2d at 1064; *United States v. Rosa*, 946 F.2d 505, 510 (7th Cir.1991). The district court's downward departure, therefore, is reversed. The case is remanded for resentencing Curran under the Guidelines.

## V. Conclusion

Based on the foregoing, the convictions and sentences of defendants Spears and Meeks are AFFIRMED. The sentence of defendant Curran is REVERSED AND REMANDED.

MORAN, Chief District Judge, concurring.

I concur. I do not join, however, in that part of the opinion that adopts a "clearly erroneous" standard of review for probable cause determinations. My reluctance is not because I am persuaded that the standard is incorrect; it is, rather, that the adoption of that standard (or, for that matter, adherence to the past standard) does not in and of itself resolve the existing differences of opinion within the circuit.

The disagreement, as I understand it, relates to the means of describing the deference a reviewing court should extend to the determination of the front line judicial officer. The concept of *de novo* review may imply almost no deference at all. The clearly erroneous standard may imply a highly deferential review bordering on the perfunctory. If those implications were accurate then both standards would be wrong. Indeed, I am not at all sure that there is any disagreement with the notion that the reviewing court should accord considerable deference but provide meaningful review.

*United States v. McKinney*, 919 F.2d 405 (7th Cir.1990), covers, in three opinions, the range of concerns. Judge Flaum there argues for a *de novo* standard in nonwarrant cases, a standard that he has recognized "can vary from relatively deferential review to comprehensive review." *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 940 (7th Cir.1989). Emphasizing that constitutional rights are implicated, he questioned the feasibility of a "chameleonic 'clearly erroneous' standard" and expressed concerns that adoption of that standard could lead to excessive deference. *McKinney*, at 411 and 415. Judge Posner pointed out that the scope of review under the clearly erroneous standard is affected by the institutional context and that the review of the legal significance ascribed to conceded facts is necessarily more searching than the review of credibility determinations. He urged that one standard, applied with varying rigor in varying contexts, was more comprehensible than a multiplicity of somewhat amorphous concepts. *Id.* at 422–423. And Judge Will, while agreeing that appellate review of the application of law to fact should be deferential, contended that reliance upon a clearly erroneous standard denigrated, psychologically and therefore in practice, the importance of appellate review of determinations implicating constitutional rights. *Id.* at 425.

The words of the standard are, in those circumstances, less important than the explanation of their meaning. Is the adoption of the clearly erroneous standard here intended to emphasize deference and minimize appellate scrutiny? That does not appear to be the thrust, but we cannot be sure.

I also agree, although somewhat reluctantly, that it has become the law of this circuit, particularly in light of *United States v. Smith*, 953 F.2d 1060 (7th Cir. 1992), that a government motion is required for a "substantial assistance" downward departure, and that such a require-

ment does not violate substantive or procedural due process.

FLAUM, Circuit Judge, with whom CUMMINGS, CUDAHY, and RIPPLE, Circuit Judges, join, dissenting from denial of hearing en banc.

I would grant an en banc hearing, and regret that the panel, in its rush to extinguish *United States v. McKinney*, 919 F.2d 405 (7th Cir.1990), has decided to reach an issue of importance without urging by the parties and without the benefit of either briefing or argument. The majority opinion in *McKinney* sets out in detail the justification for employing an intermediate "substantial basis" standard of review; I therefore add only a few thoughts here.

Although my intention is not to analyze the panel's opinion point-by-point, several matters deserve attention. First, the panel laments the fact that "considerably less attention has been paid" to the Court's use of the term "substantial evidence" in *Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 2085–86, 80 L.Ed.2d 721 (1984), than to its use of "substantial basis" in *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983). Op. at 270. This should come as no surprise. *Gates* was *the* watershed fourth amendment probable cause case, one in which the Court articulated its doctrine with the utmost precision; *Upton*, in contrast, was a brief and unargued per curiam decision that sought only to correct a state supreme court's misapplication of *Gates*. There is also the matter that *Upton* used the term "substantial basis" as well, *see Upton*, 466 U.S. at 733, 104 S.Ct. at 2088, a detail that the panel apparently chose to disregard, but one which might explain the nearly universal reliance upon the *Gates* "substantial basis" formulation.

Also worth noting is the panel's claim that employing the *McKinney* standard would "return to the 'elaborate set of legal rules' the Court eschewed in *Gates*." Op. at 270. In my view this criticism misfires. What the Court eschewed was the pre-*Gates substantive* standard that informed a magistrate's probable cause determination, 462 U.S. at 235, 103 S.Ct. at 2331 (criticizing "the complex superstructure of evidentiary and analytical rules that some have seen implicit in ... *Spinelli*" [*v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) ] ), not an "elaborate" (if one can fairly call an intermediate standard of review elaborate) standard of appellate review. *Gates* said that the standard of review should not be *de novo*, *id.* 462 U.S. at 236, 103 S.Ct. at 2331, but conspicuously did not say it should be clear error; as appellate judges we should not presume that the Court meant to say something (significant) that it quite easily could have said but did not. *McKinney*, 919 F.2d at 409–10.

At a more fundamental level, I suggest that the clear error standard serves to undermine, rather than preserve, the structure established in *Gates* and *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). This structure actually has two levels, corresponding to different strata of legal authority in the warrant process. At the first level, police officers take legal direction from magistrates; at the second, magistrates take legal direction from us, for we are—in effect, because the Supreme Court necessarily speaks in generalities in this area—the ultimate expositors of the nitty-gritty features of the fourth amendment. *Leon*'s good faith exception works at the first level by giving the government an appropriate break when police officers reasonably rely upon warrants erroneously approved by magistrates. The panel, however, does *Leon* one better by adopting what can only be dubbed a "super" good faith rule at the second level to cover magistrates that err reasonably, but not egregiously. The problem is that *Leon* was premised at least in part upon the notion that magistrates, in approving warrants, will comply with the substantive dictates of *Gates* in most instances. Were it any other way, why employ magistrates as front-line judicial officers? (Also, why continue to maintain, Justice Scalia's lonely view in *California v. Acevedo*, ——— U.S. ———, 111 S.Ct. 1982, 1992, 114 L.Ed.2d 619 (1991) (Scalia, J., concurring), notwithstanding, that warrant-

less searches are presumptively unconstitutional?) And recall that *we* ultimately determine whether the magistrates are complying with *Gates,* and correct them when they do not.

It is this dialogue—conveyed via meaningful appellate review of the magistrates' probable cause determinations—that serves *Leon* by promoting accuracy and uniformity among magistrates as to their application of the fourth amendment. One of today's decision's more unfortunate consequences will be its severe curtailment of this dialogue, and potentially adverse effect upon the thoroughness of justice meted out by magistrates. One could argue, I suppose, that the panel's decision may well serve what I see as the design of *Leon* and *Gates:* in the new "unregulated" marketplace of probable cause that the clear error standard may herald, more magistrates will inevitably comply with the dictates of the fourth amendment. There is, however, a catch. The compliance rate will rise not necessarily because magistrates will make decisions that comport with the substantive law of the circuit, but rather because of grade inflation; in other words, what would pass under the clear error standard might not under the *McKinney* standard. I doubt that is what Justice White had in mind in *Leon. See Malley v. Briggs,* 475 U.S. 335, 345–46, 106 S.Ct. 1092, 1098–99, 89 L.Ed.2d 271 (1986) (White, J.) ("It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressure, will fail to perform as a magistrate should.").

By holding schooled magistrates to virtually the same standard that we hold lay police officers, I think that we weaken the fabric of *Gates* and *Leon,* approach forsaking our responsibility as appellate judges to interpret and uphold the constitution, and implicitly countenance a potential deterioration of the quality of justice at probable cause hearings. It may be that the label we place upon our standard of review will make little difference to most of *our* decisions, including the case *sub judice.* How-

ever, I firmly believe that the degree of scrutiny we enunciate sends a critical and constant message to the bench, bar and other actors in the criminal justice system. The proper signal could promote a more considered application (and practice) of the law in this significant area; the wrong signal could have a less salutary effect.

I respectfully and regretfully suggest that today's decision does not enhance the status of this Circuit's fourth amendment jurisprudence. Those who now scuttle more searching appellate review in this crucial area deem it an extravagance and "needlessly complex." *See, e.g., McKinney,* 919 F.2d at 420–21 (Posner, J., concurring). It might be more prudent, however, to heed Justice Stewart's caveat: "[i]n times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts." *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).