In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-00-484 CR


____________________



WILLIE LEE DOUGLAS, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 258th District Court


Polk County, Texas


Trial Cause No. 15,918






OPINION


 A jury convicted appellant of the offense of Possession of a Controlled Substance
With Intent to Deliver: Cocaine. See Tex. Health & Safety Code Ann. § 481.112(a)
(Vernon Supp. 2001). Two prior felony convictions raised appellant's punishment status
to that of an habitual offender. Appellant pleaded true to the two felony enhancement
paragraphs and the jury assessed a forty-five (45) year sentence. Appellant raises a single
issue for our consideration: "The trial court erred in denying Willie Lee Douglas' Motion
to Suppress all evidence seized as the result of an illegal search of his vehicle in violation
of the Fourth Amendment to the United States Constitution and Article I, section 9 of the
Texas Constitution." 

 The record before us reflects the trial court conducted a pre-trial suppression
hearing. At the conclusion of the testimony and arguments of counsel, the trial court
denied appellant's suppression motion. (1) At the hearing, testimony from the two law
enforcement personnel involved was elicited. A videotape, Defendant's Exhibit 1, was
also admitted and played for the trial court. The videotape depicts the encounter between
Department of Public Safety Troopers Shannon Conklin and Stephanie Johnson, and
appellant and his nephew, Robert Hart. Neither appellant nor Hart testified at the
suppression hearing. 

 As mentioned above, testimony was elicited from Troopers Conklin and Johnson,
with Trooper Conklin being the lead officer during the encounter. Conklin testified that
he checked appellant's vehicle via radar traveling 40 miles per hour (m.p.h.) in an area
with the posted speed limit of 35 m.p.h. As Conklin and his partner began to pursue
appellant's vehicle, the vehicle pulled into a gas station and eventually stopped next to a
gas pump. Conklin identified the driver as Hart by a Texas "ID card" as Hart admitted
he had no driver's licence. Conklin was informed by Hart that the vehicle was owned by
appellant. Conklin then immediately began questioning Hart as to the itinerary and
purpose of the trip, where Hart worked, where Hart lived, and inquired of Hart about his
passenger. When asked to describe Hart's demeanor as he was identifying and talking to
him, Conklin responded that "Mr. Hart appeared extremely nervous," and that Conklin
observed "beads of sweat rolling off [Hart's] head," which Conklin thought unusual
because it was a cool morning and Conklin was wearing a jacket. When asked by the
State's attorney as to whether Hart was "hesitant" or "evasive" in answering his questions,
Conklin merely responded that Hart "seemed like he was unsure of his answer." When
asked next if Conklin observed Hart to be unable to stand still or to be unable to keep his
hands in plain view, Conklin responded that he could not remember. 

 Conklin then proceeded to identify appellant who was sitting in the front passenger's
position in the vehicle. Appellant handed Conklin a valid Louisiana driver's license. 
Conklin, out of Hart's presence, also questioned appellant about the nature of his trip with
Hart. At this point, the record reflects the following exchange between the State's attorney
and Conklin on direct examination: 

 Q.[State] What did he [appellant] tell you in that regard?


 A.[Conklin] During the interview I didn't understand him on some of the
things. It just didn't make sense. And I tried to recap it to him or reask
[sic] him what I thought he told me. And it - - it seemed like it - - it just
didn't make any sense what he was telling. 


 Q. Were there - - were there discrepancies between what the defendant, Mr.
Douglas, was telling you about the - - the trip that they were on and what
Mr. Hart the driver had told you?


 A. Discrepancies as far as the length of time, and the reason, yes, sir. 


 Q. Okay. And I guess, sir, as part of your - - your job as a DPS trooper
over the last several years, sir, had you also become involved with
individuals that you determined to be transporting either drugs or some other
type of illegal contraband?


 A. Yes, sir. 


 Q. Okay. And in - - in particular, when you have got multiple occupants
of a vehicle, what are you looking for when you're questioning those people? 
If you're concerned that they may be transporting contraband of some sort?


 A. Like the reason for their trip. If it's reasonable or not. The nervousness
displayed by the occupants in the vehicle. Conflicting stories. Other things. 
Odors and stuff maybe emitting from the vehicle. Things along that line. 


 Q. Okay. Well, by the time you had finished questioning the passenger in
the case, Mr. Douglas, I think you had testified that the driver was nervous
and sweating?


 A. Yes, sir. 


 Q. And that the stories were somewhat conflicting insofar as the purpose of
the trip. That, I guess, heightened your sense of concern, if any, that they
may have been trafficking some sort of contraband?


 A. It - - it made me believe there was some form of criminal activity. 
Whether it be contraband or something else. But, yes, sir, it did. 


 Following the interview of appellant, Conklin requested a criminal history check on
both Hart and appellant from the local police dispatcher using Hart's ID card and
appellant's driver's license. The dispatcher indicated that Hart had an arrest warrant
outstanding for the offense of aggravated assault, and that Hart had apparently been
arrested on some prior occasion for a controlled substance offense. With regard to
appellant, there were no pending arrest warrants or pending criminal charges outstanding. 
However, the dispatcher did indicate that appellant had a history of "dangerous drug"
"charges." Immediately after this direct examination testimony by Conklin, the following
exchange took place: 

 Q.[State] Okay. Based upon what you had developed from that point in
time, I guess, of the behavior of the occupants of the vehicle, the conflicting
stories and now added to that the fact that both of the occupants of the
vehicle had a criminal history that at least suggested arrests for drug activity
before, did you feel at that point that you had a probable cause to search the
vehicle?


 A.[Conklin] Yes, sir, I felt before actually getting the history that I had
probable cause just from their demeanor, their reason for the trip and the
circumstances. Histories help me know if it is - - maybe if they are involved
in some form of drug activity. Or if it is stolen property or forgery or just -
- it kind of helps me. It is a tool to use to determine what kind of activity
they might be involved in. 


 In addition to Conklin's belief he possessed probable cause to search appellant's
vehicle, Conklin's direct examination testimony also indicates that he believed he was
given permission by appellant to search the vehicle. Nevertheless, regardless of Trooper
Conklin's ultimate opinions as to consent to search and probable cause, it has been held
that it is the objective facts in existence at the time of the arrest or search, and not the
subjective conclusions of the officer, which the reviewing court must scrutinize to
determine the existence of probable cause. Amores v. State, 816 S.W.2d 407, 415 (Tex.
Crim. App. 1991); Johnson v. State, 722 S.W.2d 417, 419 (Tex. Crim. App. 1986) (citing
Townsley v. State, 652 S.W.2d 791, 796 (Tex. Crim. App. 1983).

STANDARD OF REVIEW


 "In reviewing a trial court's ruling, an appellate court must first determine the
applicable standard of review." Guzman v. State, 955 S.W.2d 85, 87 (Tex. Crim. App.
1997). Because of a lack of clarity in this area of the law, we will attempt to set out our
understanding of the standard an appellate court must use when reviewing a trial court's
ruling on a motion to suppress evidence in violation of the Fourth Amendment. The
leading Supreme Court case with regard to this standard is Ornelas v. United States, 517
U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and the leading Texas case,
referencing Ornelas, is Guzman, 955 S.W.2d at 87. 

 In Ornelas, we see the procedural background to be important in understanding the
Court's ultimate holdings. The defendants pleaded guilty to possession with intent to
deliver cocaine and reserved for appeal the trial court's denial of their motion to suppress. 
Ornelas, 517 U.S. at 691. The issues before the trial court were the existence of
reasonable suspicion to stop the defendants' vehicle, and the existence of probable cause
to remove an interior panel of the vehicle following a consent to search. Id. The Court
of Appeals for the Seventh Circuit stated the standard for reviewing the trial court's finding
of reasonable suspicion and probable cause to search was to do so "deferentially," and "for
clear error." Id. The Supreme Court disagreed, holding "the ultimate questions of
reasonable suspicion and probable cause to make a warrantless search should be reviewed
de novo." Id. We pick up the analysis of the Supreme Court as they set out what
precisely is involved in reviewing a trial court's determination of the existence of
reasonable suspicion and probable cause (all emphasis is added unless otherwise noted):

 The principal components of a determination of reasonable suspicion or
probable cause will be the events which occurred leading up to the stop or
search, and then the decision whether these historical facts, viewed from the
standpoint of an objectively reasonable police officer, amount to reasonable
suspicion or to probable cause. The first part of the analysis involves only
a determination of historical facts, but the second is a mixed question of law
and fact: "[T]he historical facts are admitted or established, the rule of law
is undisputed, and the issue is whether the facts satisfy the [relevant]
statutory [or constitutional] standard, or to put it another way, whether the
rule of law as applied to the established facts is or is not violated." 
Pullman-Standard v. Swint, 456 U.S. 273, 289, n. 19, 102 S.Ct. 1781,
1791, n. 19, 72 L.Ed.2d 66 (1982). 

 We think independent appellate review of these ultimate determinations of
reasonable suspicion and probable cause is consistent with the position we
have taken in past cases. We have never, when reviewing a probable-cause
or reasonable-suspicion determination ourselves, expressly deferred to the
trial court's determination. See, e.g., Brinegar, supra, (rejecting District
Court's conclusion that the police lacked probable cause); Alabama v. White,
496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (conducting
independent review and finding reasonable suspicion). A policy of sweeping
deference would permit, "[i]n the absence of any significant difference in the
facts," "the Fourth Amendment's incidence [to] tur[n] on whether different
trial judges draw general conclusions that the facts are sufficient or
insufficient to constitute probable cause." Brinegar, supra, at 171, 69 S.Ct.,
at 1308. Such varied results would be inconsistent with the idea of a
unitary system of law. This, if a matter-of-course, would be
unacceptable. 

 In addition, the legal rules for probable cause and reasonable suspicion
acquire content only through application. Independent review is
therefore necessary if appellate courts are to maintain control of, and to
clarify, the legal principles. See Miller v. Fenton, 474 U.S. 104, 114, 106
S.Ct. 445, 451, 88 L.Ed.2d 405 (1985) (where the "relevant legal principle
can be given meaning only through its application to the particular
circumstances of a case, the Court has been reluctant to give the trier of
fact's conclusions presumptive force and, in so doing, strip a federal
appellate court of its primary function as an expositor of law"). 

 Finally, de novo review tends to unify precedent and will come closer
to providing law enforcement officers with a defined " 'set of rules
which, in most instances, makes it possible to reach a correct
determination beforehand as to whether an invasion of privacy is
justified in the interest of law enforcement.' " New York v. Belton, 453
U.S. 454, 458, 101 S.Ct. 2860, 2863, 69 L.Ed.2d 768 (1981); see also
Thompson v. Keohane, 516 U.S. 99, 115, 116 S.Ct. 457, 467, 133 L.Ed.2d
383 (1995) ("[T]he law declaration aspect of independent review potentially
may guide police, unify precedent, and stabilize the law," and those effects
"serve legitimate law enforcement interests").


Ornelas, 517 U.S. at 696-98, 116 S.Ct. at 1661-62, 134 L.Ed.2d at 919-20.

 From the above portion of Ornelas, we see the Court recognizing the two aspects
of the typical hearing on a motion to suppress: 1) the taking of testimony and introduction
of physical evidence ("determination of historical facts") and, 2) the subsequent application
of the testimony and/or physical evidence to the established law by the trial court ("mixed
question of law and fact"). We see the focus of the Ornelas Court to be almost entirely
on the second aspect of the hearing, viz: whether or not the trial court correctly applied the
established law to the previously determined historical facts. 

 In Guzman, the Court of Criminal Appeals was faced with various
misinterpretations, and the resulting misapplications, of de novo review by reviewing
courts. Guzman, 955 S.W.2d at 87-89. While Ornelas focused on the second aspect of
a suppression hearing ("mixed question of law and fact") Guzman focused on the first
aspect ("determination of the historical facts") and ultimately, we believe, harmonized the
holdings in Ornelas with Texas appellate jurisprudence. This was done by the Guzman
Court in the following way: 1) Reviewing courts should give "almost total deference" to
the trial court's "determination of the historical facts that the record supports
especially when the trial court's fact findings are based on an evaluation of credibility
and demeanor;" 2) Reviewing courts should give "almost total deference" to the trial
court's application of "mixed questions of law and fact," (i.e., the trial court's application
of the established law to the previously determined historical facts) ONLY "if the
resolution of those ultimate questions turns on an evaluation of credibility and demeanor;"
and 3) Reviewing courts may engage in de novo review of the trial court's ultimate
determination, (i.e., probable cause does or does not exist) ONLY when the ultimate
determination did not turn on an evaluation of credibility and demeanor. Id. at 89
(emphasis added). This is clearly in-line with the concluding portion of Ornelas which
begins with the statement: "Having said this, we hasten to point out that a reviewing court
should take care both to review findings of historical fact only for [abuse of discretion] (2)
and to give due weight to inferences drawn from those facts by resident judges and local
law enforcement officers." Ornelas, 517 U.S. at 699, 116 S.Ct. at 1663, 134 L.Ed.2d at
920. Expanding on this point, the Ornelas Court added: "In a similar vein, our cases have
recognized that a police officer may draw inferences based on his own experience in
deciding whether probable cause exists. . . . An appeals court should give due weight to
a trial court's finding that the officer was credible and the inference was reasonable." Id.
at 700, 116 S.Ct. at 1663, 134 L.Ed.2d at 921. 

 An apparently exhausted Court of Criminal Appeals concluded its analysis in
Guzman v. State by stating: "This is about as comprehensive a statement of the applicable
standards that we can provide." Id. at 89. Nevertheless, the Court then immediately
provided the citation to a portion of the concurring opinion by Presiding Judge McCormick
in Villarreal v. State, 935 S.W.2d 134, 139 (Tex. Crim. App. 1996), which states,
"[w]here the trial court 'is not in an appreciably better position' than the appellate court
to decide the issue, the appellate court may independently determine the issue while
affording deference to the trial court's findings on subsidiary factual questions." Id. For
our purposes in the instant case, because there was no testimony introduced contradicting
that provided by the two troopers, we will take as true their rendition of the historical facts
as they unfolded following the stop of appellant's vehicle. (3) That permits us to review, de
novo, the trial court's implicit application of the law of voluntary consent to search, and
the trial court's implicit application of the law of probable cause, to said historical facts (4). 

CONSENT TO SEARCH


 Even though the record indicates that the video tape was played for the trial court
during direct examination of Conklin, it was not until Conklin's cross-examination that a
serious question arose as to the effectiveness of the consent, or, indeed, if appellant had
even given consent at all. We reproduce the pertinent portion of Conklin's cross-examination as follows: 

 Q.[Defense Counsel] Okay. He give you consent to search the car?


 A.[Conklin] Yes, sir. 


 Q. Do you mind if I search the car?" (sic) And he says "yes." You
consider that agreeing to let you search the car?


 [State's Attorney]: Judge, I'm going to object to that question. That
is not what he said on the tape. I think the tape speaks for itself as to what
the officer said.


 [Defense Counsel]: You're right. I misworded it. "Mind if I search
the car?"


 [State's Attorney]: Again. Same objection, Judge. That's not what
the tape - - -


 [Defense Counsel]: Let's play the tape.


 [State's Attorney]: Play it.


 (Tape played from 7:05:55 to 7:06:05)


 Q.[Defense Counsel] "Mind if I search the car?" That's what you said,
wasn't it?


 A.[Conklin] Yes, sir. 


 Q. And what was his answer?


 A. "Yes, sir." Yes.


 Q. Answer was yes?


 A. "Yes, sir," I think is what he said.


 [State's Attorney]: Yeah, I want the whole thing.


 [Defense Counsel]: Okay. Let me back up.


 (Tape played from 7:06:05)


 Q.[Defense Counsel] "Mind if I search the car?" He says, "Yes, sir." Is
that correct?


 A.[Conklin] Yes, sir. 


 Q. Yes. That is affirmative that he does mind you searching the car. 
That's what came out, wasn't it? 


 A. I took it as yes, it's okay to search the car.


 Q. What if he had said, "no, I don't mind you searching the car?"


 A. Sir, he didn't say anything.


 Q. What if he had said to your question, "No, I don't mind?"


 A. I guess it - - I don't know. It is hypothetical. He didn't say that.


 Q. Well, we're not dealing with hypotheticals here. We're dealing with
exactly what happened out there. You asked him, did you not, "Do you
mind if I search your car," correct?


 A. Yes, sir. 


 Q. And he said "yes, sir?"


 A. Yes, sir. 


 Q. Right? That's the affirmative answer to your question, correct?


 A. Yes, sir. 


 Q. Okay. Now, at that the point you had no warrant for him, correct?


 A. No, sir.


 Q. If you asked him, "Mind if I search the car," what is he supposed to say
if he does not want you searching the car? Yes, sir or no?


 A. I don't know, sir.


 Consent to search is one of the well-established exceptions to the constitutional
requirements of both a warrant and probable cause. Schneckloth v. Bustamonte, 412 U.S.
218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854, 858 (1973); State v. Ibarra, 953 S.W.2d 242,
243 (Tex. Crim. App. 1997). "The Fourth Amendment test for a valid consent to search
is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined
from all the circumstances.'" Ohio v. Robinette, 519 U.S. 33, 40, 117 S.Ct. 417, 136
L.Ed.2d 347, 355 (1996) (quoting Schneckloth, 412 U.S. at 248-49, 36 L.Ed.2d at 875). 
In order to be valid, the consent must not be "coerced, by explicit or implicit means, by
implied threat or covert force." Schneckloth, 412 U.S. at 228, 36 L.Ed.2d at 863; see
also Allridge v. State, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991) ("The consent must
be shown to be positive and unequivocal, and there must not be any duress or coercion.")
(citation omitted). By the same token, consent is not established by "showing no more
than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S.
543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797, 802 (1968) (where officer falsely represented
he had a valid search warrant, search not voluntary).

 "Although the federal constitution only requires the State to prove the voluntariness
of consent by a preponderance of the evidence, the Texas Constitution requires the State
to show by clear and convincing evidence that the consent was freely given." Carmouche,
10 S.W.3d at 331; Ibarra, 953 S.W.2d at 245. If the record supports a finding by clear
and convincing evidence that consent to search was free and voluntary, a reviewing court
may not disturb that finding. Carmouche, 10 S.W.3d at 331. Furthermore, we are in
somewhat of the same position as was the Carmouche Court (having a video tape of the
events in question in addition to the transcribed testimony of the witnesses) when it
included the following observation with regard to the scope of its review of the "consent
to search" issue:

 Guzman [v. State, 955 S.W.2d 85 (Tex. Crim. App. 1997)] states
that, "as a general rule, the appellate courts, including this Court, should
give almost total deference to a trial court's determination of the historical
facts that the record supports especially when the trial court's findings are
based on an evaluation of credibility and demeanor." Guzman, 955 S.W.2d
at 89 (citation omitted). In the unique circumstances of this case, however,
we decline to give "almost total deference" to the trial court's implicit
findings under which the Court of Appeals found consent. First, we note
that the trial court seems to have predicated its decision to admit the evidence
on a finding of probable cause rather than on consent. Second, the nature
of the evidence presented in the videotape does not pivot "on an evaluation
of credibility and demeanor." Rather, the videotape presents indisputable
visual evidence contradicting essential portions of [the requesting officer's]
testimony. In these narrow circumstances, we cannot blind ourselves to the
videotape evidence simply because [the requesting officer's] testimony may,
by itself, be read to support the Court of Appeals' holding.


Carmouche, 10 S.W.3d at 332. 

 Also like the circumstances in Carmouche, the record in the instant case reflects
that, at the conclusion of the suppression hearing, the State placed much more confidence
in its belief that Trooper Conklin had probable cause to search appellant's vehicle than in
whether or not appellant gave consent to search the vehicle. It is more likely than not,
therefore, that the trial court's decision to deny the suppression motion was based on a
finding of probable cause rather than on consent. And, as in Carmouche, the nature of
videotape evidence requires no credibility determination on the part of the viewer. As the
State's Attorney so succinctly phrased it, "the tape speaks for itself." 

 A review of the videotape reflects that at the point Conklin made his request to
appellant to search the vehicle, Hart had just been handcuffed by Conklin because of the
outstanding aggravated assault arrest warrant. As he handcuffed Hart, Conklin stated,
"Don't do anything stupid or I'll shoot you, you understand me." Conklin then
immediately approached the passenger side of the vehicle and requested appellant to step
out. Conklin stated to appellant, "He's wanted for aggravated assault - - turn and put your
hands on the car." Conklin then did a full body frisk of appellant. During the frisk,
Conklin asked appellant, "Ya'll have any illegal contraband in the car?" Appellant
replied, "No, sir." Conklin then immediately asked, "Have you ever been arrested for
narcotics?" Appellant answered, "Uh, no sir." Conklin immediately responded, "You've
got four charges for drugs. You going to tell me again what you've been arrested for?" 
Appellant began speaking by saying, "Ok, those drugs that I was arrested for, all that . .
. ," but was abruptly cut off by Conklin's reply, "I didn't ask you that. I asked you if
you've ever been arrested for narcotics." Again, appellant answered, "I've been arrested
before, but . . . ," and was again cut off by Conklin directing appellant with the following,
"Step back there a second. Ya'll don't have anything illegal in the car, do you?" While
appellant's reply is quite faint, the trial court, and the State, understood his response to be, 
"Yes, sir." (5) Without really waiting for appellant's reply to this question, Conklin asks,
"Mind if I search the car?" To this question, appellant's "Yes, sir" is a bit more audible. 
Conklin obviously felt he was given permission as his immediate response was, "Ok. Go
ahead and step back there." Conklin then began his search of the interior of the vehicle,
then the trunk, and finally under the hood where the contraband was ultimately located. 

 Under the particular circumstances reflected on the videotape, we find the record
does not contain clear and convincing evidence that any "consent" upon appellant's part
was given freely and voluntarily. While appellant was not facing a "darkened highway .
. . closely surrounded by four police officers" as was the defendant in Carmouche, 10
S.W.3d at 332, appellant had just been informed his nephew had been arrested, and was
in the process of being frisked while standing up against his vehicle and simultaneously
being interrogated about his criminal history. Admittedly, appellant was not truthful about
his prior arrest record for certain drug offenses. Nevertheless, Conklin became very
confrontational at that point refusing to listen to appellant's attempt to explain his
untruthfulness. Indeed, it seemed that once the police dispatcher provided Conklin with
the information on both Hart and appellant, the search of the vehicle became inevitable. 
Conklin's own testimony at the suppression hearing bears this out. 

 It is also probable that when appellant responded, "Yes, sir," to Conklin's, "Mind
if I search your car?", appellant was so totally flustered that he was merely acquiescing
to Conklin's claim of authority with any affirmative word that would form in his mouth
at that precise moment. Finally, as noted in Carmouche, appellant in the instant case was
never told during this exchange that he had a right to refuse consent. Id. at 332-33. (citing
Schneckloth, 412 U.S. at 248-49, and noting that, although not dispositive, suspect's
knowledge of right to refuse consent is one factor to be taken into account when
considering voluntariness). We therefore conclude, as did the Court in Carmouche, that
under these particular circumstances a reasonable person would not have felt they had the
choice to withhold consent to search. Thus, consent was not given voluntarily and
Conklin's search may not be justified on that basis. 

PROBABLE CAUSE 


 When attempting to get a firm grip on the law of "probable cause," a word that
repeatedly comes to mind is "daunting," and with good reason. Even a brief survey of
Fourth Amendment cases decided by the Supreme Court reveals the following
observations:

 Articulating precisely what "reasonable suspicion" and "probable cause'
mean is not possible. They are commonsense, nontechnical conceptions that
deal with "'the factual and practical considerations of everyday life on which
reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates,
462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting
Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1311, 93
L.Ed.2d 1879 (1949); see United States v. Sokolow, 490 U.S. 1, 7-8, 109
S.Ct. 1581, 1585-1586, 104 L.Ed.2d 1 (1989). As such, the standards are
"not readily, or even usefully, reduced to a neat set of legal rules." Gates,
supra, at 232, 103 S.Ct., at 2329. We have described reasonable suspicion
simply as "a particularized and objective basis" for suspecting the person
stopped of criminal activity, United States v. Cortez, 449 U.S. 411, 417-418,
101 S.Ct. 690, 694-695, 66 L.Ed.2d 621 (1981), and probable cause to
search as existing where the known facts and circumstances are sufficient to
warrant a man of reasonable prudence in the belief that contraband or
evidence of a crime will be found, see Brinegar, supra, at 175-176, 69
S.Ct., at 1310-1311; Gates, supra, at 238, 103 S.Ct. at 2332. We have
cautioned that these two legal principles are not "finely-tuned standards,"
comparable to the standards of proof beyond a reasonable doubt or of proof
by a preponderance of the evidence. Gates, supra, at 235, 103 S.Ct., at
2330-2331. They are instead fluid concepts that take their substantive
content from the particular contexts in which the standards are being
assessed. Gates, supra, at 232, 103 S.Ct. at 2329; Brinegar, supra, at 175,
69 S.Ct., at 1310 ("The standard of proof [for probable cause] is . . .
correlative to what must be proved"); Ker v. California, 374 U.S. 23, 33,
83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963) ("This Cour[t] [has a] long-established recognition that standards of reasonableness under the Fourth
Amendment are not susceptible of Procrustean application"; "[e]ach case is
to be decided on its own facts and circumstances" (internal quotation marks
omitted)); Terry v. Ohio, 392 U.S., at 29, 88 S.Ct., at 1884 (the limitations
imposed by the Fourth Amendment "will have to be developed in the
concrete factual circumstances of individual cases").


Ornelas v. United States, 517 U.S. 690, 695-96, 116 S.Ct. 1657, 1661-62, 134 L.Ed.2d
911, 918-19 (1996).

 The touchstone of the Fourth Amendment is reasonableness, and the
reasonableness of a search is determined "by assessing, on the one hand, the
degree to which it intrudes upon an individual's privacy and, on the other,
the degree to which it is needed for the promotion of legitimate governmental
interests." Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143
L.Ed.2d 408 (1999).


United States v. Knights, ___ U.S. ___, 122 S.Ct. 587, 591, 151 L.Ed.2d 497, 70
U.S.L.W. 4029 (2001). The focus of this "balancing" of interests is, in our view,
sharpened by the following observation taken from the Court's 1973 opinion in Almeida-Sanchez v. United States, which reversed a conviction involving border patrol search of
a vehicle without probable cause, and ostensibly based upon a federal statutory provision
authorizing such searches:

 It is not enough to argue, as does the Government, that the problem of
deterring unlawful entry by aliens across long expanses of national
boundaries is a serious one. The needs of law enforcement stand in constant
tension with the Constitution's protections of the individual against certain
exercises of official power. It is precisely the predictability of these
pressures that counsels a resolute loyalty to constitutional safeguards. It is
well to recall the words of Mr. Justice Jackson, soon after his return from
the Nuremberg Trials:


 'These (Fourth Amendment rights), I protest, are not mere
second-class rights but belong in the catalog of indispensable
freedoms. Among deprivations of rights, none is so effective
in cowing a population, crushing the spirit of the individual
and putting terror in every heart. Uncontrolled search and
seizure is one of the first and most effective weapons in the
arsenal of every arbitrary government.' Brinegar v. United
States, 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed.
1879 (Jackson, J., dissenting).


 The Court that decided Carroll v. United States, supra, sat during a period
in our history when the Nation was confronted with a law enforcement
problem of no small magnitude - - the enforcement of the Prohibition laws. 
But that Court resisted the pressure of official expedience against the
guarantee of the Fourth Amendment. Mr. Chief Justice Taft's opinion for
the Court distinguished between searches at the border and in the interior,
and clearly controls the case at bar:


 'It would be intolerable and unreasonable if a prohibition
agent were authorized to stop every automobile on the chance
of finding liquor and thus subject all persons lawfully using the
highways to the inconvenience and indignity of such a search. 
Travellers may be so stopped in crossing an international
boundary because of national self protection reasonably
requiring one entering the country to identify himself as
entitled to come in, and his belongings as effects which may be
lawfully brought in. But those lawfully within the country,
entitled to use the public highways, have a right to free
passage without interruption or search unless there is known
to a competent official, authorized to search, probable cause
for believing that their vehicles are carrying contraband or
illegal merchandise.' 267 U.S., at 153-154, 45 S.Ct., at 285.


Almeida-Sanchez v. United States, 413 U.S. 266, 273-75, 93 S.Ct. 2535, 2540, 37
L.Ed.2d 596, 603-04 (1973).

 In an attempt to enlighten ourselves on the "touchstone" of the Fourth Amendment
"reasonableness," we set out the following observations:

 In enforcing the Fourth Amendment's prohibition against unreasonable
searches and seizures, the Court has insisted upon probable cause as a
minimum requirement for a reasonable search permitted by the Constitution. 
As a general rule, it has also required the judgment of a magistrate on the
probable-cause issue and the issuance of a warrant before a search is made. 
Only in exigent circumstances will the judgment of the police as to probable
cause serve as a sufficient authorization for a search. Carroll, supra, holds
a search warrant unnecessary where there is probable cause to search an
automobile stopped on the highway; the car is movable, the occupants are
alerted, and the car's contents may never be found again if a warrant must
be obtained. Hence an immediate search is constitutionally permissible. 


 . . . .


 For constitutional purposes, we see no difference between on the one hand
seizing and holding a car before presenting the probable cause issue to a
magistrate and on the other hand carrying out an immediate search without
a warrant. Given probable cause to search, either course is reasonable under
the Fourth Amendment. 


Chambers v. Maroney, 399 U.S. 42, 51-52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428
(1970). A more recent exposition of "reasonableness" vis-a-vis the search of an
automobile illustrates that the Court's view on this Fourth Amendment issue has been
fairly consistent:

 The Fourth Amendment generally requires police to secure a warrant
before conducting a search. California v. Carney, 471 U.S. 386, 390-391,
105 S.C. 2066, 85 L.Ed.2d 406 (1985). As we recognized nearly 75 years
ago in Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed.
543 (1925), there is an exception to this requirement for searches of
vehicles. And under our established precedent, the "automobile exception"
has no separate exigency requirement. We made this clear in United States
v. Ross, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), when
we said that in cases where there was probable cause to search a vehicle "a
search is not unreasonable if based on facts that would justify the issuance
of a warrant, even though a warrant has not been actually obtained."
(emphasis added)


Maryland v. Dyson, 527 U.S. 465, 466-67, 119 S.Ct. 2013, 2014, 144 L.Ed.2d 442, 445
(1999). (emphasis added) 

 As further aid to a reviewing court, it must be remembered that, regardless of
whether a given set of facts and circumstances are determined by a reviewing court to
constitute probable cause, as opposed to reasonable suspicion, it is axiomatic that there is
a higher standard for the existence of probable cause than for the existence of reasonable
suspicion. Florida v. J.L., 529 U.S. 266, 272, 120 S.Ct. 1375, 1379, 146 L.Ed.2d 254
(2000); United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45
L.Ed.2d 607, 616 (1975) ("[I]n appropriate circumstances the Fourth Amendment allows
a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to
arrest or to search for contraband or evidence of crime."); Almeida-Sanchez, 413 U.S. at
268 ("[T]here was no probable cause of any kind for the stop or the subsequent search - -
not even the 'reasonable suspicion' found sufficient for a street detention and weapons
search in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and Adams v.
Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612.").

 Lastly, we must touch upon a portion of Ornelas that has caused some confusion,
with this court possibly contributing its fair share. (6) It is contained in a single paragraph,
but does have great significance with regard to the standard of appellate review:

 The Court of Appeals, in adopting its deferential standard of review here,
reasoned that de novo review for warrantless searches would be inconsistent
with the "'great deference'" paid when reviewing a decision to issue a
warrant, see Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d
527 (1983). See United States v. Spears, 965 F.2d 262, 269-271 (C.A.7
1992). We cannot agree. The Fourth Amendment demonstrates a "strong
preference for searches conducted pursuant to a warrant," Gates, supra, at
236, 103 S.Ct., at 2331, and the police are more likely to use the warrant
process if the scrutiny applied to a magistrate's probable-cause determination
to issue a warrant is less than that for warrantless searches. Were we to
eliminate this distinction, we would eliminate the incentive.


Ornelas, 517 U.S. at 698-99.


It would appear that the Court is making a distinction, for appellate review purposes,
between warrantless searches and searches conducted pursuant to a warrant issued by a
magistrate. This is so because, as the Court reminds both bench and bar, the Fourth
Amendment prefers that law enforcement secure a warrant from a neutral magistrate prior
to conducting a search or seizure. Because of the proliferation of "exceptions" to the
warrant requirement, such a statement must seem, at first blush, to be a radical concept. 
Nevertheless, we do recognize the reasonableness of making such a distinction for
appellate review purposes as we cannot ultimately permit "the tail to wag the dog" as this
tends to reward less than acceptable investigative work by law enforcement at the expense
of the privacy interests of citizens. 

 The Court's distinction is also an apparent recognition of the fact that at a
suppression hearing involving a search warrant, it is the "four corners" of the probable
cause affidavit that is under scrutiny; while at hearings where a warrantless search was
conducted, credibility determinations are a regular part of the trial court's "factfinding"
duties. One should recall that both Ornelas and Guzman instruct reviewing courts to
provide deference only to trial court rulings that involve credibility determinations. Since
technically there is no credibility determination to be made when merely examining the
"four corners" of a probable cause affidavit, the Ornelas Court has built in a "due
deference" requirement at the appellate review level. 

 Therefore, for purposes of appellate review of Fourth Amendment issues involving
probable cause, search warrant cases will always require a measure of deference to the
magistrate's finding of probable cause, even though there is technically no credibility
determination to be made, while cases involving warrantless searches will be reviewed
without deference to the trial court's ultimate ruling when credibility of the witnesses is
not involved. In the instant case, one should recall that there was no credibility issue
before the trial court as no witnesses or other evidence refuted the "historical facts" as
elicited from the troopers.

 As a general matter, the decision to stop an automobile is reasonable where the
police have probable cause to believe that a traffic violation has occurred. Whren v.
United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 95 (1996). Therefore,
appellant cannot, and does not, complain of the initial "detention" by the troopers for the
traffic offense of speeding. Hart's failure to produce a valid driver's license permitted the
troopers to continue to detain Hart and appellant in order to further investigate their
backgrounds. It was certainly not unreasonable for Conklin to check both individuals for
outstanding warrants. Davis v. State, 947 S.W.2d 240, 245 n. 6 (Tex. Crim. App. 1997). 
And under these particular circumstances, it was probably not unreasonable for Conklin
to request information on the vehicle's ownership, the purpose of the trip, and the ultimate
destination of the driver and passenger. See Zervos v. State, 15 S.W.3d 146, 151 (Tex.
App.--Texarkana 2000, pet. ref'd).

 In its brief, the State contends that the trial court "found" that the video tape
revealed: "1) When asked if there were illegal narcotics in the car, Appellant replied 'yes,
sir[.]' " Yet, as noted above, the question actually put to appellant by Conklin, as depicted
on the video tape, was "Ya'll don't have anything illegal in the car, do you?" Even if we
were to fully concede that appellant's reply was "Yes, sir," the State recognized the
ambiguity in such a response during its re-direct questioning of Conklin at the hearing: 
 Q.[State] It really doesn't matter at that point what he said, did it?


 A.[Conklin] Not really, sir, no, sir.


 Q. One thing I noted, the first - - right before you asked him, "Mind if I
search the car," you said, "You don't have anything illegal in the car?" Do
you recall asking that?


 A. Yes, sir.


 Q. And then he said, "Yes, sir," was how he responded. Yes, sir, I do have
something illegal in the car? Or yes, sir, I don't have something illegal in
the car? How did you interpret that?


 A. Same way. I mean it is either way.


 Q. In any event you felt like you had probable cause to search the car?


 A. Yes, sir.


 Q. Based on the conflicting stories based on the nervousness of the driver,
his behavior, based on the criminal history involving drugs?


 A. Yes, sir. 


(emphasis added)


 We agree with the implication in both the State's question to Conklin and with
Conklin's answer - - appellant's "Yes, sir" response was ambiguous at best based upon
how Conklin's question was put. As such, we find that, under the totality of the
circumstances from both testimony and video tape, appellant's response of "Yes, sir" does
not provide a reasonable basis for searching appellant's vehicle for contraband. Under the
particular circumstances as they were quickly unfolding, coupled with the particular way
Conklin put the question to appellant regarding illegal contraband in the vehicle, we find
that a response of "Yes, sir" is ambiguous at best and provides no support which would
warrant a police officer of reasonable prudence in believing that contraband would be
found upon a search of the vehicle. See Garcia v. State, 43 S.W.3d 527, 531 (Tex. Crim.
App. 2001) (An officer's mistaken belief that a certain fact possesses a tendency to create
reasonable suspicion is not determinative of whether reasonable suspicion actually existed.) 

 We next observe that when Conklin was provided information that an active arrest
warrant was outstanding for Hart, clearly Conklin had probable cause to arrest Hart. At
the same time, however, Conklin was also informed that appellant had no outstanding
warrants, only a prior arrest for a drug-related offense. At this point, based upon the
totality of the circumstances, the "known facts and circumstances" in Conklin's possession
included: (1) Hart was nervous and sweating while being questioned; (2) Hart's version
of the events surrounding the trip were somewhat inconsistent when compared with
appellant's version, which was also confusing; (3) Hart had no valid driver's license and
had an outstanding warrant of aggravated assault, and prior drug-related arrests; (4)
Appellant had a history of "dangerous drug" "charges," from the information provided by
the police dispatcher; and (5) appellant was not initially truthful about his prior drug-related arrest record. Taken together, these facts were sufficient to permit Conklin to
continue detaining appellant for a reasonable amount of time in order to have his suspicions
of the presence of drugs in the vehicle confirmed. (7) However, at the point Conklin began
his search of the vehicle, the facts before him amounted to nothing more than a hunch with
regard to the presence of illegal contraband being located somewhere in the vehicle. 
"[The] demand for specificity in the information upon which police action is predicated is
the central teaching of . . . Fourth Amendment jurisprudence." Terry, 392 U.S. at 21 n.
18, 88 S.Ct. at 1880 n. 18, 20 L.Ed.2d at 906 n. 18. Having found no outstanding
warrants extant for appellant, Conklin should have turned the vehicle back over to
appellant and taken Hart to the nearest facility for processing based upon the aggravated
assault warrant. 

 Prior to permitting appellant to reenter his vehicle, Trooper Conklin would have
been permitted to search the passenger compartment for weapons for his personal safety
as well as that of his partner, Trooper Johnson. See Knowles v. Iowa, 525 U.S. 113, 117-18, 119 S.Ct. 484, 142 L.Ed.2d 492, 498-99 (1998). While this limited exception to the
warrant requirement permitted Trooper Conklin's search of the passenger area of
appellant's vehicle for safety reasons, Conklin continued with what amounted to a general
exploratory search, of the entire vehicle without probable cause. Such exploratory
searches are clearly impermissible. See Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506,
13 L.Ed.2d 431 (1965); Joseph v. State, 807 S.W.2d 303, 307 (Tex. Crim. App. 1991).

 We conclude our probable cause analysis by quoting selected portions of United
States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), a case turning on
the presence or absence of "reasonable suspicion" for the stop of a vehicle. We feel it
strongly speaks to the situation with which we are faced in the instant case, in that the
Cortez Court seems to crystalize what is meant, for Fourth Amendment purposes, by the
requirement to consider the "totality of the circumstances" when a reviewing court is
attempting to determine if probable cause has been established from a set of particular
historical facts:

 But the essence of all that has been written is that the totality of the
circumstances - - the whole picture - - must be taken into account. Based
upon that whole picture the detaining officers must have a particularized and
objective basis for suspecting the particular person stopped of criminal
activity. See, e.g., Brown v. Texas, supra, at 51, 61 L.Ed.2d 357, 99 S.Ct.
2637; United States v. Brignoni-Ponce, supra, at 884, 45 L.Ed.2d 607, 95
S.Ct. 2574. 

 The idea that an assessment of the whole picture must yield a
particularized suspicion contains two elements, each of which must be
present before a stop is permissible. First, the assessment must be based
upon all of the circumstances. The analysis proceeds with various objective
observations, information from police reports, if such are available, and
consideration of the modes or patterns of operation of certain kinds of
lawbreakers. From these data, a trained officer draws inferences and makes
deductions - - inferences and deductions that might well elude an untrained
person.


 . . . .


 The second element contained the idea that an assessment of the whole
picture must yield a particularized suspicion is the concept that the process
just described must raise a suspicion that the particular individual being
stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the
Court in Terry v. Ohio, supra, said that "[t]his demand for specificity in the
information upon which police action is predicated is the central teaching of
this Court's Fourth Amendment jurisprudence." Id., at 21, n. 18, 20
L.Ed.2d 889, 88 S.Ct. 1868, 44 Ohio Ops 2d 383 (emphasis added). See
also Brown v. Texas, supra, at 661-663, 59 L.Ed.2d 660, 99 S.Ct. 1391;
United States v. Brignoni-Ponce, 422 U.S., at 884, 45 L.Ed.2d 607, 95
S.Ct. 2574.

 This case portrays at once both the enormous difficulties of patrolling a
2,000-mile open border and the patient skills needed by those charged with
halting illegal entry into this country. It implicates all of the principles just
discussed - - especially the imperative of recognizing that, when used by
trained law enforcement officers, objective facts, meaningless to the
untrained, can be combined with permissible deductions from such facts to
form a legitimate basis for suspicion of a particular person and for action on
that suspicion. We see here the kind of police work often suggested by
judges and scholars as examples of appropriate and reasonable means of law
enforcement. Here, fact on fact and clue on clue afforded a basis for the
deductions and inferences that brought the officers to focus on "Chevron."


Id. at 418-19, 101 S.Ct. at 690, 66 L.Ed.2d at 629. 

 In the instant case, Trooper Conklin's law enforcement background was elicited as
follows: 

 Q.[State] How are you employed?


 A.[Conklin] Texas Department of Public Safety, Highway Patrol Service. 

 Q. Okay. How long have you been involved with the DPS patrol, sir?


 A. Since August 16th, 1996.


 Q. And are you a certified peace officer here in the State of Texas?


 A. Yes, sir. 


Thereafter, we have no solid evidence that Trooper Conklin had any experience with
regard to investigating drug trafficking or drug traffickers. Nor are we made aware of the
number of encounters with persons ultimately found to be transporting drugs Trooper
Conklin had experienced prior to his encounter with appellant. We are given "hints" that
Trooper Conklin did have some experience with drug traffickers from the following
testimony: 

 Q.[State] Okay. And I guess, sir, as part of your - - your job as a DPS
trooper over the last several years, sir, had you also become involved with
individuals that you determined to be transporting either drugs or some other
type of illegal contraband?


 A.[Conklin] Yes, sir.


 Q. Okay. And in - - in particular, when you have got multiple occupants
of a vehicle, what are you looking for when you're questioning those people? 
If you're concerned that they may be transporting contraband of some sort?


 A. Like the reason for their trip. If it's reasonable or not. The nervousness
displayed by the occupants in the vehicle. Conflicting stories. Other things. 
Odors and stuff maybe emitting from the vehicle. Things along that line.


Later, a second "hint" appeared: 


 Q.[State] And what did you find if anything in terms of drugs or illegal
contraband?


 A. Due to a search under the engine compartment, I noticed that the entire
engine was dirty. On the air breather - - and which from my experience I
know it is an area that people use to conceal contraband - - there were fresh
prints or smudge markings on top of the air breather. I had unsnapped the
air breather. Pulled the air filter out. And there was a plastic bag of white
powder which I believed to be cocaine. 


 This is certainly evidence of "experience" of a kind, but nowhere in the record does
Conklin explain or expound upon, based upon his training and experience, how the five
known historical facts set out above permitted him to reasonably infer or reasonably
deduce that appellant's automobile contained contraband. Without this type of testimony,
as observed by the Court in Cortez, any such inferences or deductions made by Conklin
regarding the five historical facts "might well elude an untrained person." If the State,
through Conklin, intended to supply greater inferences from the five objective facts as set
out above, Conklin "gave neither the trial court, nor this Court, any objective way of
determining what else he may have meant." Garcia, 43 S.W.3d at 531. From the totality
of the circumstances provided in the record before us, we are simply not prepared to lower
the bar so as to essentially equate the established legal construct of "probable cause" to the
level of what could possibly be merely "reasonable suspicion," or even less. "[T]he legal
rules for probable cause and reasonable suspicion acquire content only through
application." Ornelas, 517 U.S. at 697, 116 S.Ct. at 1661, 134 L.Ed.2d at 919.
(emphasis added) We conclude that the trial court erred in finding a free and voluntary
consent to search on the part of appellant, and/or of finding probable cause to support
Trooper Conklin's search of the vehicle. The contraband recovered from said search
should have been suppressed. 

 Appellant's suppression motion also prayed for suppression of "[a]ny statements"
obtained from appellant. Generally, evidence obtained as a direct result of illegal police
conduct, be it illegal arrest or illegal search, is suppressed either by cases providing the
remedy of exclusion of such evidence for violations of the Fourth Amendment and/or
Article 1, section 9 of the Texas Constitution, or by statutory provisions such as Tex.
Code Crim. Proc. Ann. art. 38.23 (Vernon Pamph. 2001). See Boyd v. United States,
116 U.S. 616, 638, 6 S.Ct. 524, 29 L.Ed. 746, 754 (1886); Bell v. State, 724 S.W.2d
780, 787 (Tex. Crim. App. 1986). 

 The primary purpose of the federal exclusionary rule and of article 38.23 is to deter
unlawful police conduct by precluding the use against the accused of evidence obtained by 
illegal police activity. (8) See also United States v. Calandra, 414 U.S. 338, 347-48, 94
S.Ct. 61 3, 38 L.Ed.2d 561, 571 (1974). The federal exclusionary rule and article 38.23
extend not only to evidence obtained as a direct result of an illegal arrest, search, or
seizure, but also to evidence obtained as an indirect result of an illegal arrest, search, or
seizure, known as the "fruit of the poisonous tree." See Wong Sun v. United States, 371
U.S. 471, 485-86, 83 S.Ct. 407, 9 L.Ed.2d 441, 453-54 (1963); Smith v. State, 542
S.W.2d 420, 422 (Tex. Crim. App. 1976); State v. Mayorga, 876 S.W.2d 176, 177 (Tex.
App.--Dallas 1994), aff'd and remanded, 901 S.W.2d 943 (Tex. Crim. App. 1995). 

 On the other hand, both the federal and state exclusionary rules allow the admission
of otherwise tainted evidence if the connection between the initial illegality and the
discovery of the challenged evidence has become so attenuated as to dissipate the taint of
the prior illegality. See Wong Sun, 371 U.S. at 487-88, 9 L.Ed.2d at 455; Johnson v.
State, 871 S.W.2d 744, 751 (Tex. Crim. App. 1994) (holding attenuation analysis
applicable under article 38.23 as a method of determining whether evidence was
"obtained" in violation of law). Evidence is not classified as a fruit requiring exclusion
merely because it would not have been discovered "but for" the primary illegality. See
Wong Sun, 371 U.S. at 487-88, 9 L.Ed.2d at 455. Rather, the issue is whether the
evidence was obtained by exploitation of the primary illegality or by means sufficiently
distinguishable to be purged of the primary taint. See id. at 488, 9 L.Ed.2d at 455. The
prosecution bears the burden of showing unlawfully obtained evidence is admissible under
an exception to the federal exclusionary rule. See Brown v. Illinois, 422 U.S. 590, 604,
95 S.Ct. 2254, 45 L.Ed.2d 416, 427 (1975); Alderman v. United States, 394 U.S. 165,
183, 89 S.Ct. 961, 22 L.Ed.2d 176, 192 (1969); see also Nix v. Williams, 467 U.S. 431,
444-45, 104 S.Ct. 2501, 81 L.Ed.2d 337, 387-88 (1984) (burden of proof on prosecution
to show exception to exclusionary rule by preponderance of evidence). The prosecution
also has the burden under article 38.23 to show the applicability of the attenuation doctrine
to challenged evidence. See Brown, 422 U.S. at 604, 45 L.Ed.2d at 427; Boyle v. State,
820 S.W.2d 122, 131 (Tex. Crim. App. 1989), disavowed on other grounds by, Gordon
v. State, 801 S.W.2d 899, 911 n. 13 (Tex. Crim. App. 1990) (burden on State to prove
attenuation).

 In Texas, reviewing courts apply the following four-factor attenuation test found in
Brown v. Illinois:

 (1) the giving of Miranda warnings;


 (2) the temporal proximity of the arrest and the confession;


 (3) the presence of intervening circumstances; and 


 (4) the purpose and flagrancy of the official misconduct.

 

See Dowthitt v. State, 931 S.W.2d 244, 261 (Tex. Crim. App. 1996). 

 In the instant case, the record reflects that Conklin first encountered appellant and
Hart at about 7:00 a.m. Based upon the video, the arrest took place about twenty minutes
after the initial encounter. The record further reflects that appellant was informed of his
Miranda rights at the time of his arrest and prior to writing the statement. State's Exhibit
1, a copy of appellant's statement, indicates that it began at "8:30 a.m." with the statement
completed at "8:55 a.m." The testimony is silent as to any intervening circumstances,
such as being taken before a magistrate, speaking to an attorney, or any unforseen
interruptions during the taking of the statement. With regard to purpose and flagrancy of
Conklin's illegal search, we find the following taken from Brown v. Illinois to be uncannily
appropriate, even though in Brown the police misconduct involved an illegal arrest:

 The illegality here, moreover, had a quality of purposefulness. The
impropriety of the arrest was obvious; awareness of that fact was virtually
conceded by the two detectives when they repeatedly acknowledged, in their
testimony, that the purpose of their action was "for investigation" or for
"questioning." (footnote and record references omitted) The arrest, both
in design and in execution, was investigatory. The detectives embarked
upon this expedition for evidence in the hope that something might turn up. 


Brown v. Illinois, 422 U.S. at 605, 45 L.Ed.2d at 428.

 It is clear from viewing the videotape that, from the start of the encounter with
Hart, Conklin's actions had the "quality of purposefulness" to them of establishing a set
of factors, commonly known as a "drug courier profile," as to Hart and appellant in order
to eventually justify a search of the vehicle. Conklin immediately separated Hart and
appellant so that he could interview each of them out of ear-shot of the other, his attempts
to "clarify" the stories provided by Hart and appellant served only to increase confusion
rather than diminish it, and Conklin's failure to appreciate that appellant's "Yes, sir"
literally meant appellant did indeed mind if Conklin searched his vehicle, point to this
"quality of purposefulness" which culminated in the illegal search of the vehicle. Other
than speeding and driving without a licence, the record provides nothing to indicate that
at the time of the search of the vehicle, probable cause existed to believe that either Hart
or appellant were engaged in or were about to engage in a specific criminal offense of any
kind, or that the vehicle did contain contraband. Conklin simply "embarked upon this
expedition for evidence in the hope that something might turn up." Id. 

 While the giving of the Miranda warnings is a factor that militates in favor of the
State, the very brief time between the illegal search and the taking of the statement, the
lack of any intervening circumstances and the expeditionary purpose for the search of the
vehicle favor a finding that the taint of the illegal search had not been sufficiently
attenuated by the time the statement was taken. It has been held that "time" is the least
important factor, see Bell, 724 S.W.2d at 788, and that "purpose and flagrancy of official
misconduct" weighs heaviest, Self v. State, 709 S.W.2d 662, 668 (Tex. Crim. App. 1986),
in evaluating any attenuation of taint. The trial court therefore erred in failing to suppress
the statement. 

 Tex. R. App. P. 44.2(a) provides that if the appellate record reveals constitutional
error that is subject to harmless error review, the reviewing court must reverse a judgment
of conviction unless the court determines beyond a reasonable doubt that the error did not
contribute to the conviction. In the instant case, the four witnesses at trial were Troopers
Conklin and Johnson, the chemist from the crime lab who confirmed the contraband was
cocaine, and appellant in his own defense. Normally, without the contraband, the State
cannot successfully prosecute an accused. See Veal v. State, 28 S.W.3d 832, 838 (Tex.
App.--Beaumont 2000, pet. ref'd) (citing to Villalobos v. State, 999 S.W.2d 132, 136
(Tex. App.--El Paso 1999, no pet.), and Graham v. State, 893 S.W.2d 4, 8 (Tex. App.--Dallas 1994, no pet.)). However, we also have appellant's incriminating statement that
should have been suppressed as well as the contraband. This statement affirmatively linked
appellant to knowing possession of the contraband located in his vehicle. See Brown v.
State, 911 S.W.2d 744, 748 (Tex. Crim. App. 1995); King v. State, 895 S.W.2d 701, 703
(Tex. Crim. App. 1995). We cannot say that the trial court's error in failing to suppress
both the contraband and the statement made no contribution to appellant's conviction
beyond a reasonable doubt. The appellate issue before us is sustained. The judgment of
the trial court is reversed and the cause remanded to the trial court for further proceedings
consistent with this opinion. 

 REVERSED AND REMANDED. 









 _______________________________

 RONALD L. WALKER

 Chief Justice



Submitted on November 6, 2001

Opinion Delivered April 10, 2002

Do Not Publish


Before Walker, C.J., Burgess and Gaultney, JJ.



CONCURRING OPINION


 I agree totally with Chief Justice Walker's standard of review and probable cause
analyses and concur with the result. I write only to differ slightly with the Chief on the
consent issue. Under the question posed and the answer given, I do not believe consent
was given. But I do agree that the record does not contain clear and convincing evidence
that the consent, if given at all, was free and voluntary. Therefore, I briefly concur.





 DON BURGESS

 Justice


Concurrence Delivered

April 10, 2002

Do Not Publish


DISSENTING OPINION



 Officer Conklin testified appellant consented to the search. The majority concludes
the consent was not voluntary. Based on the officer's testimony, I disagree with that
conclusion.

 I also disagree with the majority's conclusion that Officer Conklin lacked probable
cause. We should give due weight to the trial court's determination that the officer was
credible and that the inferences he drew from the circumstances were reasonable. The
presence of a videotape does not necessarily transform the standard of review into a de
novo standard. The officer testified that he stopped the car because of a traffic violation,
and then he discovered the driver had no license. The officer found inconsistencies in the
stories of the passenger and the driver; he learned that the driver had an outstanding
warrant for his arrest, that appellant had an arrest record for drug offenses, and that
appellant was untruthful about his drug arrest record; and he observed the driver was
sweating and nervous. Based on his experience in law enforcement, Officer Conklin
concluded probable cause existed to search the vehicle. The trial court heard his
testimony, viewed the videotape, and agreed with that conclusion. While the majority calls
the officer's conclusion "a hunch," I give due weight to the trial court's determination that
the officer was credible and that the inferences the officer drew from the circumstances
were reasonable.

 The majority concludes that the videotape generally supports the officer's testimony.
For that reason, this case is not like Carmouche. In Carmouche, a videotape provided
"indisputable visual evidence contradicting essential portions" of the officer's testimony. 
See Carmouche v. State, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000).

 Bottom line, I am troubled by what I perceive to be the majority's substitution of
its interpretation of the circumstances -- based apparently on a review of the videotape. 
For example, the majority interprets the officer's actions as having the "quality of
purposefulness." My review of the videotape shows mounting concern by the officer as
he learns more and more about the circumstances he and his partner have confronted. I
would give due weight to the trial court's determination that the officer was credible and
that the inferences the officer drew from the circumstances were reasonable. I respectfully
dissent.


 _________________________________

 DAVID B. GAULTNEY

 Justice


Dissent Delivered

April 10, 2002

Do Not Publish








1. When a pretrial motion to suppress evidence is overruled, the accused need not
subsequently object to the admission of the same evidence at trial in order to preserve
error. When, however, a party affirmatively asserts during trial that he or she has "no
objection" to the admission of the complained-of evidence, said party waives any error in
the admission of the evidence despite the pretrial ruling. Gearing v. State, 685 S.W.2d
326, 329 (Tex. Crim. App. 1985), rev'd on other grounds, 956 S.W.2d 33 (Tex. Crim.
App. 1997); Harris v. State, 656 S.W.2d 481, 484 (Tex. Crim. App. 1983). In the instant
case, the State marked Exhibits 2 through 7 during the trial. The State then began
questioning Trooper Conklin as to the exhibits. The State then only tendered into evidence
Exhibits 2 through 6. The following exchange then took place:


 [State's Attorney]: Judge, at this time the State would offer into
evidence State's Exhibits numbers 2 through 6.


 [Trial Counsel]: 6?


 [State's Attorney]: Yeah, I'm not going to offer 7.


 [Trial Counsel]: I have got no objection to that.


 THE COURT: State's Exhibits Numbers 2 through 6 are
admitted into evidence. 


Because it is unclear whether appellant's trial counsel was indicating that he had no
objection to the State's decision not to offer Exhibit 7, which was merely a container, or
was announcing a blanket "no objection" to the contraband, we will not find waiver of the
issue for appellate purposes, in the interest of justice. 
2. See Ornelas, 517 U.S. at 695 n. 3, 116 S.Ct. at 1661 n. 3, 134 L.Ed.2d at 918 n.
3.
3. It has been held that when "indisputable visual evidence" contradicts essential
portions of an officer's testimony, the reviewing court does not have to give "almost total
deference" to the trial court's implicit determinations of the historical facts. Carmouche
v. State, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000). In the instant case, the video tape
depiction of the events generally supports the testimony of the troopers. Any possible
discrepancies will be considered by us as implicitly establishing a fact favorable to the trial
court's implicit rulings of either the presence of voluntary consent and/or probable cause
for the search of appellant's vehicle, so long as implying said fact is reasonable under the
totality of the circumstances.
4. We use the word "implicit" because we have no formal findings of fact and
conclusions of law in the record before us. As these were the only two rules of law that
would have permitted the troopers to lawfully search appellant's vehicle under the facts of
this case, we will focus our analysis on those two alone.
5. We will explain why this response is not as significant as it appears in our analysis
of probable cause, infra.
6. See the comments contained in the Fifth District's case, Lane v. State, 971 S.W.2d
748, 752 n. 3 (Tex. App.--Dallas 1998, pet. ref'd), regarding our discussion of Ornelas
and Guzman v. State in Barton v. State, 962 S.W.2d 132, 137 (Tex. App.--Beaumont 1997,
pet. ref'd).
7. This is typically accomplished by use of a "drug-sniffing" dog.
8. Specifically, article 38.23(a) provides:

 No evidence obtained by an officer or other person in violation
of any provisions of the Constitution or laws of the State of
Texas, or of the Constitution or laws of the United States of
America, shall be admitted in evidence against the accused on the
trial of any criminal case.